UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMMEX, INC.,

       Plaintiff,

v.

GORDON WENK, *in his capacity as
Director, Michigan Department of
Agriculture & Rural Development*,

       Defendant.

Case No. 2:18-cv-10751
Honorable Laurie J. Michelson

---

**OPINION AND ORDER
DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [8]**

---

After the United States Environmental Protection Agency designated southeast Michigan as not in attainment of national air-quality standards, Michigan came up with a plan to improve air quality in the region. This included enacting Michigan Compiled Laws § 290.650d. That statutory provision requires dispensing facilities in southeast Michigan to sell gasoline with a Reid Vapor Pressure of no more than 7.0 pounds per square inch during the summer. As Ammex, Inc.'s gas station is located in southeast Michigan, the Michigan Department of Agriculture & Rural Development intends to enforce § 290.650d against Ammex this summer.

While Ammex's gas station is located in southeast Michigan, the station is more precisely located right before the Ambassador Bridge connecting the United States and Canada. In fact, the station is located beyond what United States Customs and Border Protection considers the "exit point" from the United States. Moreover, the station is part of a duty-free store and for a duty-free store to sell gasoline tax free, the gasoline must come from a foreign country (or foreign trade zone), stay beyond the exit point, and be sold to people leaving the United States. Indeed, the

physical design of Ammex's gas station ensures that those who refuel there must immediately head into Canada. For these and related reasons, Ammex believes that MDARD would violate the Federal Constitution if it enforced Michigan Compiled Laws § 290.650d against it.

The parties' disagreement, coupled with Ammex's present inability to find a foreign source of 7.0 RVP gasoline, led to this lawsuit. Ammex asks this Court to enjoin MDARD from enforcing § 290.650d (and associated laws) against it and to declare that § 290.650d cannot be lawfully applied to it. Moreover, with summer imminent, Ammex has sought a preliminary injunction. (R. 8.)

As will be explained in detail below, the Court finds that Ammex is not likely to show that either the Supremacy Clause or the Foreign Commerce Clause bars MDARD from enforcing a 7.0 RVP standard against Ammex. As such, the Court will deny Ammex's motion for preliminary relief.

## I.

## A.

Customs bonded warehouses have existed in America for over 170 years. *See Xerox Corp. v. Harris Cty., Tex.*, 459 U.S. 145, 150–51 & n.7 (1982) (discussing Warehousing Act of 1846). They come in different varieties, but, speaking generally, they help ease the burden of federal import duties. In particular, a merchant engaged in international trade can store his goods in a customs bonded warehouse and either defer the import duty until he puts the goods into the stream of United States commerce or avoid the import duty entirely by taking his goods from the warehouse to another country. *See* 19 U.S.C. § 1557(a)(1); *Xerox*, 459 U.S. at 150–51 & n.7. And, depending on the type of customs bonded warehouse, the merchant may organize, repackage, and even transform his goods into new ones while they are warehoused. *See* 19 C.F.R. § 19.1. Thus,

the purpose of customs bonded warehouses, or a key one at least, is "to encourage merchants here and abroad to make use of American ports." *Xerox*, 459 U.S. at 151.

A duty-free store, while still considered a customs bonded warehouse, *see* 19 U.S.C. § 1555(b); 19 C.F.R. § 19.1(a)(9), operates somewhat differently: the store's owner sells merchandise to those leaving the United States, *see* 19 C.F.R. § 19.35(a). Like proprietors of other customs bonded warehouses, the owner of a duty-free store does not pay an import duty on the goods he brings into his store from a foreign country (or foreign trade zone). Moreover, he can sell his goods free of federal, and at least in some instances, state taxes. *See* 19 U.S.C. § 1555(b)(8)(D), (E); *Ammex, Inc. v. Dep't of Treasury*, 726 N.W.2d 755, 766–69 (Mich. Ct. App. 2006). That makes items that are heavily taxed, such as liquor and cigarettes, popular at duty-free stores. And, in Congress' view, lower-cost goods not only "play a significant role in attracting international passengers to the United States," Pub. Law 100-418 (1988), they "induce foreign visitors to increase their expenditures for goods in the United States," S. Rep. 100-71 (1987).

Plaintiff Ammex, Inc. operates a duty-free store near the Ambassador Bridge that connects Detroit, Michigan to Windsor, Canada. While Ammex's store is in Wayne County, Michigan, it is "beyond the exit point" established by the United States Customs and Border Protection. (R. 20, PID 732). "Exit point," for CBP purposes, is not the "actual exit" from the United States but near the actual exit, *see* 19 C.F.R. §§ 19.1(a)(9), 19.35(d), 101.1(e); it is the point where a departing individual has "no practical alternative" other than to continue to a foreign country or return to this one through a CBP inspection facility, 19 C.F.R. § 19.35(d).

While Ammex sells goods commonly found at duty-free stores, since the late 1990s Ammex has also sold gasoline. (*See* R. 29, PID 852.) Ammex's gas station is designed to ensure that cars that refuel there continue onto Canada afterwards. (R. 8, PID 94); *see also Ammex, Inc.*

*v. United States*, 419 F.3d 1342, 1343 (Fed. Cir. 2005). Apparently, tax-free gas is popular: Ammex sells 400,000 gallons a month. (*See* R. 29, PID 852–53.)

## B.

In 1970, dissatisfied "with earlier efforts at air pollution abatement," Congress made major changes to the Clean Air Act. *Friends of the Earth v. Carey*, 535 F.2d 165, 168–69 (2d Cir. 1976). In particular, Congress directed the United States Environmental Protection Agency to establish National Ambient Air Quality Standards. *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 65 (1975). But Congress did not intend the Environmental Protection Agency to battle air-pollution alone; instead, it directed each state to submit a plan—known as a state implementation plan or SIP—for implementing, maintaining, and enforcing the NAAQS. *See id.*; 42 U.S.C. § 7410(a)(1). The states' implementation plans were subject to EPA approval, as were any post-approval changes to the plans. *See N. Ohio Lung Ass'n v. E.P.A.*, 572 F.2d 1143, 1147 (6th Cir. 1978). That is still true today. *See* 42 U.S.C. § 7410(k), (*l*).

In 1990, Congress again made major changes to the Clean Air Act. For one, Congress set a national Reid Vapor Pressure standard for gasoline. *See* 42 U.S.C. § 7545(h). In particular, Congress ordered the EPA to promulgate regulations prohibiting anyone (in the "48 contiguous States") from selling—or even "dispens[ing]" or "supply[ing]"—gasoline with an RVP higher than 9.0 pounds per square inch. *See* 42 U.S.C. § 7545(h)(1), (6). Moreover, it appears that Congress prohibited states from holding gasoline to a different RVP standard, *see* § 7545(c)(4)(A)(ii), unless the EPA both found the state's RVP standard was "necessary" to achieve a NAAQS and approved it as part of the state's implementation plan, *see* 42 U.S.C. § 7545(c)(4)(C)(i); 71 Fed. Reg. 46879, 46880 (Aug. 15, 2006).

In 2004, the EPA designated eight counties in southeast Michigan as in "nonattainment" of the NAAQS for ozone. 71 Fed. Reg. 46879, 46880 (Aug. 15, 2006). This included Wayne County where Ammex is located. (R. 18, PID 562.)

This forced Michigan to come up with a strategy to bring southeast Michigan into attainment. (*See* R. 18, PID 562.) Part of the strategy was to require gas stations to use lower RVP gasoline in the summer months. (R. 18, PID 562; *see also* R. 18, PID 537, 542). In particular, Michigan enacted House Bill 5508, which says in part, "Beginning June 1 through September 15 of 2007 and for that period of time each subsequent year, the vapor pressure standard shall be 7.0 psi for dispensing facilities in Wayne" and seven other counties in southeast Michigan. (R. 18, PID 542.) And the Bill defined "dispensing facilities" as "a site used for gasoline refueling." (R. 18, PID 537.) Those two provisions of House Bill 5508 are now found in Michigan Compiled Laws § 290.650d and § 290.642, respectively. The Court will refer to § 290.650d, § 290.642, and associated state laws and regulations (e.g., Michigan Compiled Laws § 290.645(10) and Michigan Administrative Code Rules 285.561.1–3) as the "Summer-Fuel Laws."

In 2006, Michigan asked the EPA to approve most of House Bill 5508, including the 7.0 RVP standard and the associated enforcement provisions, as a revision to its state implementation plan. *See* (R. 18, PID 529); 71 Fed. Reg. 46879, 46880 (Aug. 15, 2006). The EPA reviewed Michigan's request to revise its implementation plan and found that it was consistent with the requirements of the Clean Air Act and that Act's implementing regulations. 71 Fed. Reg. 46879, 46881 (Aug. 15, 2006). But it did more. Because House Bill 5508 set an RVP for gasoline different than the national standard set by Congress, the EPA also found that the 7.0 RVP was "necessary" to achieve NAAQS. 71 Fed. Reg. 46879, 46881 (Aug. 15, 2006); 72 Fed. Reg. 4432, 4433 (Jan. 31, 2007). Upon making those findings, the EPA proposed to approve Michigan's SIP revision

and solicited comments to the contrary. *See* 72 Fed. Reg. 4432, 4433–34 (Jan. 31, 2007). Ammex provided none. *See id.*

On January 31, 2007, the EPA found Michigan's 7.0 RVP standard "necessary for Southeast Michigan to achieve the 8-hour NAAQS for ozone" and "approv[ed] [the] SIP revision submitted by the State of Michigan . . . establishing a 7.0 psi RVP fuel requirement for gasoline distributed in Southeast Michigan." 72 Fed. Reg. 4432, 4434 (Jan. 31, 2007). The EPA further amended the Code of Federal Regulations to "incorporat[e] by reference" "House Bill 5508." *Id.* at 4435.

## C.

In the summer of 2012, the Michigan Department of Agriculture & Rural Development— the Michigan entity responsible for enforcing the Summer-Fuel Laws—tested gasoline Ammex was selling, found that it had an RVP of more than 7.0 psi, and thus issued Ammex a "Stop Sale Order." (R. 13, PID 223.)

The parties' dispute ended up in state court, but was resolved—for a time. Under a settlement, Ammex agreed to sell gas that complied with the 7.0 RVP standard "[b]etween June 1 and September 15 of each year." (R. 13, PID 226.) The settlement contained a "retention of jurisdiction" provision giving MDARD three years to return to the state court where it filed suit to enforce the settlement agreement. (R. 13, PID 227.)

Consistent with the settlement agreement, during the summers of 2013, 2014, 2015, 2016, and 2017, Ammex sold duty-free gasoline that had a RVP of 7.0 psi during the summer months.

## D.

But Ammex says it cannot do that this upcoming summer. In particular, Ammex's foreign (or, more precisely, foreign trade zone) supplier has an issue with one of its tanks. And while there

are other foreign sources where Ammex could obtain gasoline, Ammex claims that none of those sell 7.0 RVP gasoline. And while there are domestic sources that sell 7.0 RVP gasoline, buying from those would preclude Ammex from selling gasoline tax-free. In any event, says Ammex, domestic gasoline would have to be stored in different tanks which would be cost prohibitive. *But see* 19 C.F.R. § 19.36(e)(2). This rock and a hard place, coupled with MDARD's indication that it will require Ammex to comply with the 7.0 RVP standard this summer (R. 1, PID 4–5), prompted Ammex to file this lawsuit.

Ammex's complaint consists of two counts. In Count I, Ammex says that the dormant side of the Foreign Commerce Clause prevents Wenk from enforcing the Summer-Fuel Laws against it. (R. 1, PID 12–14.) From Ammex's perspective, if Wenk enforced those laws, Michigan would be unconstitutionally discriminating against foreign commerce, regulating commerce beyond its borders, and infringing on Congress' right to be the "one voice" for the Nation on foreign commerce. (*See* R. 8, PID 82–86.) In Count II, Ammex asserts that the Supremacy Clause prevents Wenk from enforcing the Summer-Fuel Laws against it. (R. 1, PID 14–15.) From Ammex's perspective, Congress and U.S. Customs and Border Protection regulate the entire field of products sold at duty-free shops so Michigan laws that affect what can be sold are preempted. (*See* R. 8, PID 81–82.) Ammex also claims the Summer-Fuel Laws are preempted because they conflict with Congress' goals for duty-free shops. (*Id.*) For these reasons, Ammex asks this Court to enjoin MDARD's director, Gordon Wenk, from enforcing the Summer-Fuel Laws against it. (R. 1, PID 14–15.)

And Ammex asks this Court to do so in a hurry. Ammex stresses that June 1, 2018 (the date when the Summer-Fuel Laws come into effect) is looming and that without an injunction in

place it will either have to sell gas in violation of the 7.0 standard or simply not sell gas at all. It thus seeks a preliminary injunction. (R. 8.)

## II.

Wenk argues that this Court does not have subject-matter jurisdiction over Ammex's complaint for two reasons: because he, as a state official sued in his official capacity, is immune from suit in federal court and because the Clean Air Act requires Ammex to pursue relief in the Court of Appeals for the Sixth Circuit. (R. 7, PID 49–53.) The Court disagrees with Wenk.

### A.

Although often referred to as Eleventh Amendment immunity, sovereign immunity extends beyond the text of the Eleventh Amendment and "limits the grant of judicial authority in Art. III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984); *N. Ins. Co. of New York v. Chatham Cty., Ga.*, 547 U.S. 189, 193 (2006) ("Eleventh Amendment immunity . . . is convenient shorthand but something of a misnomer[.]" (internal quotation marks omitted)). Under the doctrine of sovereign immunity, absent waiver by Michigan or abrogation by Congress, Michigan and its instrumentalities cannot be sued in a federal court. *See Pennhurst*, 465 U.S. at 98–100; *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997). Moreover, a suit against a state official in his official capacity, like Ammex's suit against Wenk, is treated as a suit against the state itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

That said, some types of official-capacity suits can proceed in federal court under the *Ex parte Young* exception to sovereign immunity. The idea (courts sometimes call it a "fiction") behind the *Ex parte Young* exception is that when a state law is contrary to federal law, any attempt by the official to enforce the state law is not on behalf of the state. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011). Thus, under *Ex parte Young*, a plaintiff may sue

a state official in his official capacity in federal court so long as the plaintiff seeks to enjoin the official from violating federal law now and in the future. *See Edelman v. Jordan*, 415 U.S. 651, 667–68 (1974); *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013).

Wenk says that is not what Ammex is seeking to do. In Wenk's view, House Bill 5508 and its 7.0 RVP standard are federal law. (R. 7, PID 41, 43.) So, says Wenk, Ammex's suit is not to prevent him from violating federal law but to avoid its own violation of federal law this summer. (R. 7, PID 50.) "This," says Wenk, "turns the *Ex parte Young* exception on its head." (R. 7, PID 50.)

Not so. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (internal quotation marks and citation omitted). So the right-side-up view of the issue is not whether Ammex seeks to avoid complying with federal law but whether Ammex seeks to enjoin a state official from violating federal law. And in deciding whether Ammex has pled a violation of federal law, the Court need not assess (at any depth at least) the merits of Ammex's claims. *See Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012) (finding district court erred in applying *Twombly* and *Iqbal*'s plausibility standard to conclude that *Ex parte Young* exception did not apply). Instead, for jurisdiction purposes, this Court merely determines whether Ammex has "state[d] a non-frivolous, substantial claim for relief against the [s]tate officers that does not merely allege a violation of federal law solely for the purpose of obtaining jurisdiction." *Id.* (internal quotation marks omitted).

Ammex has. As described in some detail above, Ammex has pled that if Wenk were to enforce the Summer-Fuel Laws against it this summer, he would violate the Federal Constitution. (*See* R. 1, PID 12–15.) Right or wrong, these claims are neither frivolous nor made solely for the purpose of manufacturing jurisdiction. As such, Michigan's sovereign immunity does not prevent a federal court from deciding Ammex's claims against Wenk. *See Muscogee (Creek) Nation*, 669 F.3d at 1167.

**B.**

Wenk also claims that the Clean Air Act's judicial-review provision strips this Court of jurisdiction. (R. 7, PID 52.) That statutory provision provides, in relevant part, "[a] petition for review of the Administrator's *action in approving or promulgating* any implementation plan under section 7410 of this title . . . or *any other final action* of the Administrator under this chapter which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." 42 U.S.C. § 7607(b)(1) (emphasis added). It further states that any such petition for review must "be filed within sixty days from the date notice of such *promulgation, approval, or action* appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise." *Id.* (emphasis added). Wenk believes that Ammex challenges the EPA's approval of Michigan's revision to its SIP in 1997. (R. 7, PID 52.) Thus, in Wenk's view, Ammex filed this suit "two decades too late and in the wrong court." (R. 7, PID 53.)

The Court disagrees with Wenk.

As an initial matter, it seems that the relevant EPA action was in 2007, not 1997. In 1997, the EPA merely approved a "summertime gasoline RVP limit of *7.8* psi for gasoline sold in Wayne" and other counties. 62 Fed. Reg. 24341, 24342 (May 5, 1997) (emphasis added). It was

not until 2007 that EPA approved RVP of 7.0: "What action is EPA taking today? EPA is approving a SIP revision . . . establishing a 7.0 psi RVP fuel requirement for gasoline distributed in Southeast Michigan." 72 Fed. Reg. 4432, 4434 (Jan. 31, 2007).

But whether the relevant EPA action is the 1997 approval or the 2007 approval, what is not debatable is that the judicial-review provision's "any other final action" clause does not apply. *See* 42 U.S.C. § 7607(b)(1). That clause appears to be a catchall. *See id.* And so it would only apply if none of the clauses that preceded it did. But one does. The first clause of the judicial review says, "[a] petition for review of the Administrator's *action in approving* or promulgating *any implementation plan under section 7410 . . . .*" *See* 42 U.S.C. § 7607(b)(1) (emphasis added). Section 7410 provides for EPA approval of revisions to state implementation plans and that is just what the EPA did in both 1997 and 2007.

So the question then is whether Ammex's complaint seeks "review of the Administrator's action in approving . . . any implementation plan." 42 U.S.C. § 7607(b)(1). If yes, then Ammex should have pursued relief in the Court of Appeals (and done so long ago); if no, then Ammex's suit is properly filed here.

The answer is "no." Ammex's lawsuit is limited to claims that the Summer-Fuel Laws cannot be enforced against it without violating the Constitution. Ammex is not saying that the EPA was wrong to "approv[e]" House Bill 5508 as a revision to Michigan's SIP. That is, Ammex neither claims that the EPA failed to follow proper procedures in approving a SIP revision nor claims that EPA's approval of a SIP revision was arbitrary or capricious. Instead, Ammex merely claims that the Summer-Fuel Laws cannot be lawfully applied to it. *See Utah Power & Light Co. v. Envtl. Prot. Agency*, 553 F.2d 215, 218 (D.C. Cir. 1977) ("Only by straining the meaning of the words 'approving' and 'promulgating' could it be said that challenges to interpretations or applications

11

of EPA regulations constitute attacks on 'the Administrator's action in approving or promulgating' any state implementation plan."); *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 264 F. Supp. 3d 1040, 1047 (N.D. Cal. 2017) (finding that a "challenge to 'a particular interpretation or application' of a SIP, which if accepted would not invalidate the SIP[,] . . . is properly considered by the district court").

In arguing for a different result, Wenk primarily relies on *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500 (9th Cir. 2015), and decisions by the Fourth and Eighth Circuits discussed in *Dump Truck Owners*. But the plaintiffs' claims in those three cases are materially different from Ammex's claims in this case.

In *Dump Truck Owners*, an association of dump-truck operators sought to enjoin the California Air Resources Board (CARB) from enforcing a state law regulating heavy-duty truck emissions. *See* 784 F.3d at 503, 507. The association claimed that the state law was preempted by federal law. *Id.* While the association's suit was pending in district court, the EPA approved the state law as a revision to California's SIP. *Id.* at 504. The association argued that the EPA's approval did not mean that the Clean Air Act's judicial-review provision stripped the district court of jurisdiction. According to the association, it was only challenging the state law and not the EPA's approval of the state law as a SIP revision. *Id.* at 505. And, the association argued, it was not challenging any provision of the SIP. *Id.* at 505. Indeed, the association took the position that "even after EPA approval, there remain[ed] 'a state regulation on the books that [was] subject to preemption.'" *Id.* at 505 & n.6.

For three reasons, the Ninth Circuit was not persuaded. For one, it thought that "the SIP's effectiveness depend[ed] largely on its enforcement by the state," and so if the association's suit was successful, it "would effectively nullify that provision of California's SIP." 784 F.3d at 507,

508 n.9. The Court further reasoned that the association's preemption argument challenged the EPA's finding that it was aware of no federal law that stood as an "obstacle" to CARB's ability to implement the regulation on heavy-duty truck emissions. *Id.* at 510. Finally, the Ninth Circuit found that the policy underlying the Clean Air Act's judicial-review provision, "speedy review of EPA rules and final actions in a single court," would be undermined if the association's suit proceeded in district court. *Id.* at 511. So, the Ninth Circuit concluded, the association should have petitioned it, not the district court, for relief.

Despite obvious similarities with this case, there is at least one critical difference between the association's claims in *Dump Truck Owners* and Ammex's claims. There, the association argued that because its members would have to increase their prices and change their routes to comply with the state law, the state law was preempted by federal laws governing motor-carrier pricing and routes. 784 F.3d at 503; *see also California Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1141 (E.D. Cal. 2012). This argument was not limited to any one dump-truck company or even the members of the association. In other words, if the association were correct about preemption, CARB would not have been able to enforce the state law against *any* heavy-duty truck operator. And so there was reason to think that the association's suit, "if successful, would effectively eviscerate the SIP by precluding its enforcement by CARB." 784 F.3d at 508. Not so here. Ammex's success would only inure to the benefit of Ammex. There is no other gas station in southeast Michigan that could echo Ammex's arguments, for they are all grounded in its unique status as a customs bonded warehouse that sells gasoline that must enter Canada. So Ammex's success would not "nullify" or "effectively eviscerate" any provision of Michigan's SIP.

That leaves the Fourth and Eighth Circuit decisions Wenk relies on.

In *Virginia v. United States*, the EPA found that two of Virginia's programs did not satisfy the Clean Air Act. 74 F.3d 517, 521 (4th Cir. 1996). Virginia sued, asserting that the Clean Air Act provisions that the EPA relied on were unconstitutional. *Id.* at 522. The Fourth Circuit found that "although [Virginia sought] a ruling that certain parts of the CAA [were] unconstitutional, the practical objective of the complaint [was] to nullify final actions of EPA." *Id.* at 523. As such, Virginia needed to pursue relief in the court of appeals. *Id.*

In *Missouri v. United States*, the EPA issued Missouri "five formal deficiency findings." 109 F.3d 440, 441–42 (8th Cir. 1997). Instead of contesting those findings, Missouri sought to have the "sanctions they portend[ed] declared unconstitutional." *Id.* at 442. As that would have "nullif[ied]" the effect of the EPA's findings, the Eighth Circuit found that Missouri had to pursue relief in the court of appeals. *Id.*

This case is not like *Virginia* or *Missouri*. In those cases, states either sought to invalidate the Clean Air Act provisions that the EPA relied upon to take action or sought to invalidate the sanctions associated with the EPA's action. In other words, if successful, Virginia and Missouri would have rendered the EPA's actions either unlawful or without effect. That is not what Ammex is attempting to do. As explained, the EPA's actions were approving revisions to Michigan's SIP. Ammex merely claims that Summer-Fuel Laws cannot be constitutionally applied to it. Ammex thus does not seek to render any EPA action unlawful or without effect.

In short, § 7607(b)(1) does not mandate that Ammex seek relief in the Court of Appeals.

\* \* \*

In sum, neither Michigan's sovereign immunity nor the Clean Air Act's judicial-review provision deprive this Court of subject-matter jurisdiction over Ammex's claims. The Court thus turns to the merits.

### III.

"[P]reliminary injunctions are extraordinary and drastic remedies never awarded as of right." *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015). A plaintiff seeking preliminary relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 615–16 (6th Cir. 2018).

### IV.

Ammex is unlikely to succeed in this case. As will be explained, the 7.0 RVP standard in § 290.650d appears to be a federal regulation and Ammex has conceded that if that is so, "then no Supremacy or Commerce [C]lause issues would exist with respect to that law." (R. 33, PID 885.) And, as will also be explained, even assuming in Ammex's favor that the Summer-Fuel Laws are purely state laws, Ammex has not shown that the Supremacy Clause or the Foreign Commerce Clause bars Wenk from enforcing the Summer-Fuel Laws against it.

### A.

Throughout his briefing, Wenk has argued that House Bill 5508, or at least § 290.650d, is federal law. (R. 7, PID 43; *see also* R. 7, PID 54; R. 13, PID 189; R. 21, PID 745; R. 32, PID 875.) Wenk appears to be correct.

One way a state law made part of a state implementation plan looks like a federal law is that it makes a limited appearance in the Code of Federal Regulations. When the EPA approves a revision to a state implementation plan, the corresponding state rule is "[i]ncorporat[ed] by reference" into the CFR. For example, the CFR says, "(a) *Purpose and scope.* This section sets forth the applicable State Implementation Plan (SIP) for Michigan . . . . (b) *Incorporation by*

*reference.* Material listed in paragraph[] (c) . . . of this section with an EPA approval date prior to May 1, 2016, was approved for incorporation by reference by the Director of the Federal Register . . . ." 40 C.F.R. § 52.1170. Paragraph (c), in turn, lists many Michigan regulations, statutes, and executive orders by name, including "House Bill 5508." *See* 40 C.F.R. § 52.1170.

True, a listing in the CFR could just be for notice purposes. After all, state implementation plans are made up of a plethora of state rules. Without collecting them in one place, it might be difficult to know what laws comprise a SIP. *See* 42 U.S.C. § 7410(h) (requiring the EPA to "assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State" and to "publish notice in the Federal Register of the availability of such documents"); *see also* 78 Fed. Reg. 71508, 71510 (Nov. 29, 2013) ("EPA's action on each State's SIP is promulgated in 40 CFR part 52. . . . The goal of the State-by-State SIP compilation is to identify those rules . . . which are currently federally enforceable."). So House Bill 5508's "incorporation by reference" into the Code of Federal Regulations does not, by itself, show that it is federal law.

But House Bill 5508 looks like federal laws in another way: a federal agency can and, in some cases, must enforce its provisions. In particular, if the EPA found that a gasoline station in southeast Michigan was selling gas in the summer with a RVP higher than 7.0 psi, the EPA could "issue an order requiring [the gas station owner] to comply," "issue an administrative penalty order" against the station owner, or even sue him in court. 42 U.S.C. § 7413(a)(1). Moreover, if the EPA found that Michigan had a habit of not enforcing its SIP, it could not only step in to enforce it, *see* 42 U.S.C. § 7413(a)(2), it could also sanction the state for its failure to do so, 42 U.S.C. § 7509(a), (b). In other words, while Congress undoubtedly made the states the primary enforcers of their implementation plans, Congress also made the EPA ultimately responsible for

ensuring compliance with those plans. *See* 42 U.S.C. §§ 7413(a)(2), 7509(a), (b). This is especially so following the 1990 amendments to the Clean Air Act. *See* Steve Novick & Bill Westerfield, *Whose SIP is it Anyway? State–Federal Conflict in Clean Air Act Enforcement*, 18 Wm. & Mary J. Envtl. L. 245, 266–68 (1994); *Engine Mfrs. Ass'n v. U.S. E.P.A.*, 88 F.3d 1075, 1079 (D.C. Cir. 1996) ("In contrast to federally encouraged state control over stationary sources, regulation of motor vehicle emissions had been a principally federal project.").

Thus, not only do the Code of Federal Regulations incorporate House Bill 5508 and its 7.0 RVP standard, that standard is also partly—and ultimately—a federal agency's responsibility to enforce.

It is likely for these two reasons that numerous courts, including the Sixth Circuit Court of Appeals, have said that when the EPA approves a state law to be part of a SIP, the state law "becomes" federal law. *Sierra Club v. Korleski*, 681 F.3d 342, 343 (6th Cir. 2012) ("[I]f the EPA approves a State's proposal, then the SIP is added to the Code of Federal Regulations and becomes federal law."); *Mirant Potomac River, LLC v. U.S. E.P.A.*, 577 F.3d 223, 227 (4th Cir. 2009) ("Upon approval by EPA, the SIP becomes a binding federal regulation."); *Safe Air For Everyone v. U.S. E.P.A.*, 488 F.3d 1088, 1096–97 (9th Cir. 2007) ("[T]he SIP became *federal* law, not *state* law, once EPA approved it[.]" (internal quotation marks omitted)); *Majesty the Queen in Right of the Province of Ont. v. City of Detroit*, 874 F.2d 332, 335 (6th Cir. 1989) ("If a [SIP] is approved by the EPA, its requirements become federal law[.]"); *Union Elec. Co. v. E.P.A.*, 515 F.2d 206, 211 (8th Cir. 1975) (providing that upon EPA approval, the requirements of a SIP "have the force and effect of federal law"); *Clean Air Council v. Mallory*, 226 F. Supp. 2d 705, 721 (E.D. Pa. 2002) ("[B]y seeking to compel compliance with programs that are included in the EPA-approved Pennsylvania SIP, plaintiff is seeking to enforce federal law, not state law."); *United States v.*

*Congoleum Corp.*, 635 F. Supp. 174, 177 (E.D. Pa. 1986) ("When the EPA approves the state plan, . . . the plan is absorbed into federal law.").

And even if not every state law made part of a SIP becomes a federal regulation, there are good reasons to think that the 7.0 RVP standard for southeast Michigan became one.

Start with the fact that it was the EPA which prompted the 7.0 RVP standard. As mentioned, the EPA found that southeast Michigan was a "nonattainment" area. And while in theory Michigan could have accomplished attainment in a variety of ways, in fact there were no practicable measures to bring about timely attainment other than lowering the RVP for gasoline to 7.0 psi. *See* 71 Fed. Reg. 46879, 46881 (Aug. 15, 2006).

Second, it appears that Michigan could not even enact a 7.0 RVP standard without the EPA finding that it was necessary. In the EPA's view at least, Congress prohibited states from enacting RVP standards for gasoline that differed from the national 9.0 standard found at 42 U.S.C. § 7545(h)(1). *See* 42 U.S.C. § 7545(c)(4)(A); 71 Fed. Reg. 46879, 46881 (Aug. 15, 2006); 54 Fed. Reg. 11868, 11882 (Mar. 22, 1989) (explaining that "the Clean Air Act prohibits states from enacting controls on a fuel that are different from EPA controls"). The only (relevant) exception is when the EPA finds the differing standard "necessary" and approves it as part of a SIP. *See* 42 U.S.C. § 7545(c)(4)(C)(i). So had Michigan enacted § 290.650d but not obtained EPA approval, it appears that the law would be invalid as preempted by the Clean Air Act. *See* 42 U.S.C. § 7545(c)(4)(A); 71 Fed. Reg. at 46881; 54 Fed. Reg. at 11882. Thus, it appears that § 290.650d has no legal existence apart from EPA approval and inclusion in Michigan's SIP.

Third, consider that both the Michigan legislature and MDARD now have no ability to do anything but adhere to § 290.650d. The Clean Air Act prohibits states from "adopt[ing] or enforc[ing] any emission standard or limitation which is less stringent than the standard or

limitation" in its implementation plan. 42 U.S.C. § 7416. This means that, absent EPA approval, Wenk cannot choose not to enforce § 290.650d and the Michigan legislature cannot amend § 290.650d to set a different RVP standard or alter its coverage. *See United States v. Ford Motor Co.*, 814 F.2d 1099, 1102 (6th Cir. 1987) (noting "overwhelming authority declaring that revisions of State Implementation Plans are ineffective until approved by EPA"); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1168–71 (D. Ariz. 2001) (holding that state could not alter, repeal, or elect not to enforce a state law after incorporation into SIP).

Summarizing these last three points, the EPA required Michigan to lower ozone and the only feasible plan included a 7.0 RVP standard, it appears that Michigan's enactment of that standard had no legal effect unless and until the EPA found it "necessary," and the 7.0 RVP standard remains the law unless and until the EPA says otherwise. Short of the EPA actually promulgating § 290.650d, how could it be more federal?

That said, the Court ultimately declines to find that § 290.650d is a federal regulation and instead will assume, as Ammex claims, that the EPA's approval of House Bill 5508 as part of Michigan's SIP merely made state laws enforceable by a federal agency. (*See* R. 14, PID 247; R. 33, PID 883.) There are several reasons for choosing this analytical path.

First, the EPA has not been clear about whether it believes that by approving a state law as part of a SIP, it is promulgating a federal regulation. In approving the 7.0 RVP standard for southeast Michigan, the EPA at one point indicated that the standard was a federal regulation: "The Congressional Review Act . . . generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress . . . . EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, . . ." *Id.* at 4435. But at other points, the

EPA suggested that the 7.0 RVP standard was merely a state law. *See* 72 Fed. Reg. 4432, 4434 (Jan. 31, 2007) ("This action merely approves state law as meeting Federal requirements and imposes no additional requirements beyond those imposed by state law"); *id.* at 4434 ("This action merely approves a state rule implementing a Federal standard.").

Second, it may be that the judicial opinions stating that state law "becomes" federal law may have been imprecisely worded. *See Kentucky Res. Council, Inc. v. E.P.A.*, 467 F.3d 986, 988 (6th Cir. 2006) ("The EPA reviews each proposed SIP, and a SIP becomes federally *enforceable* once it is approved by the EPA" (emphasis added)); *Greenbaum v. U.S. E.P.A.*, 370 F.3d 527, 531 (6th Cir. 2004) ("If the EPA approves the SIP, . . . the approved provisions become *enforceable* by the federal government." (emphasis added)).

Third, it could be the case when the EPA approves a SIP revision, the state law remains a state law but the SIP includes an identical federal law, i.e., there are parallel provisions. *But see California Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1141 n.7 (E.D. Cal. 2012); *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 508 n.9 (9th Cir. 2015).

Fourth, while Ammex seems to concede that a finding that the provisions of House Bill 5508 are federal regulations defeats its claims under the Supremacy Clause and Foreign Commerce Clause, Ammex is quick to add that "[t]here would remain, for purposes of those clauses[,] . . . a need to determine the intended scope of CAA regulation of fuel volatility." (R. 33, PID 885.) Apparently then, a finding that § 290.650d is a federal law would not resolve Ammex's preliminary-injunction motion. Instead, the new battleground would be the scope of § 290.650d

and whether it applies to Ammex. Not only is that terrain relatively uncharted by the parties, it might be necessary to draw a third entity—the EPA—into that fray.[1]

Finally, answering the state-or-federal-law question is not absolutely necessary to resolve Ammex's motion for preliminary relief. Ammex has taken the position that it is challenging state law. (*See* R. 14, PID 247; R. 33, PID 883.) So the Court may assume that Ammex is correct on this point if Ammex's Foreign Commerce Clause and Supremacy Clause claims nonetheless fail. And that is the case, as will be explained next.

## B.

The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. And if Congress has the power to regulate foreign commerce, then, by implication, the states do not. In other words, the Foreign Commerce Clause has a "dormant" side. Ammex says that Michigan's Summer-Fuel Laws violate the dormant Foreign Commerce Clause in three different ways. (*See* R. 8, PID 82–86.)

## 1.

Although relegating the argument to a conclusory footnote in its motion (R. 8, PID 82 n.4), Ammex spent much of oral argument asserting that Michigan's Summer-Fuel Laws fail the two-step test set out in *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578 (1986). Ammex believes that the Summer-Fuel Laws directly regulate or discriminate against foreign commerce and thus are subject to, but cannot withstand, heightened scrutiny. And Ammex

---

[1] The Court acknowledges Ammex's claim that, in 1989, the EPA stated that it did not intend the national RVP standard to apply to "gasoline which is exported" (R. 14, PID 246), but notes that the EPA also stated that the standards were "intended to fully cover the introduction of gasoline into motor vehicles," 54 Fed. Reg. 11868, 11871–72 (Mar. 22, 1989).

claims, even if the Summer-Fuel Laws are not subject to heightened scrutiny, they are still unconstitutional.

Before delving into the particulars of Ammex's argument, it helps to get a better understanding of the *Brown-Forman* framework. When a state law is alleged to be a violation of the Interstate Commerce Clause (more on "Interstate" below), courts perform a two-step analysis. In the Sixth Circuit, the first step focuses on whether the state law is protectionist: does it favor in-state economic interests over out-of-state ones? *See Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644–45 (6th Cir. 2010) (noting that the "'direct/incidental' distinction ha[d] fallen out of use in dormant commerce clause analysis"). If yes, then the state law is "virtually *per se* invalid," surviving only if it is necessary and there are no less discriminatory alternatives. *Id.* at 644. But if the state law is not protectionist, then it need only survive less-demanding "*Pike* balancing." *Id.*

The Court flagged the fact that the *Brown-Forman* framework has been applied in the context of the Interstate Commerce Clause. Although Ammex asserts the Foreign Commerce Clause, it says that the *Brown-Forman* framework still applies. Whether that is accurate or not is also a question that the Court need not answer. As the Court finds that the Summer-Fuel Laws are not protectionist and that they pass the *Pike* balancing test, the Court can assume Ammex is correct that *Brown-Forman* applies to claims under the Foreign Commerce Clause.

With the framework in place, the Court turns to the specifics of Ammex's argument. Ammex points out that the summer-fuel regulations require dispensing facilities to sell gasoline with a RVP of 7.0 psi but permit a vehicle manufacturer to use higher RVP gas at its "proving grounds," "testing facilities," and "assembly facility." Mich. Admin. Code R. 285.561.7. As Michigan is the home of the "Big Three," i.e., America's three largest vehicle manufacturers,

Ammex infers that Michigan's summer-fuel regulations favor in-state economic interests. (*See* R. 14, PID 252.)

Ammex has not shown that the Foreign Commerce Clause concerns itself with this variety of protectionism. While the summer-fuel regulations favor vehicle-manufacturing facilities over gas stations, it does not matter whether the facilities and stations are owned or operated by in- or out-of-state companies. *See Int'l Dairy Foods*, 622 F.3d at 649. If Ammex operated a vehicle-testing facility instead of a gas station it would, like every other such operator, be able to use gas with a RVP above 7.0 psi this summer. The difference in treatment turns on the type of business, not whether the business is a Michigan or non-Michigan company. As such, the discrimination Ammex has identified is not the concern of the Foreign Commerce Clause. *See LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 804 (6th Cir. 2005) (finding Tennessee law prohibiting retail eyewear companies from leasing space to optometrists but permitting optometrists to sell eyewear was not discriminatory for dormant Commerce Clause purposes); *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 500 (5th Cir. 2001) (finding Texas law prohibiting car manufacturers from acting as car dealers but permitting all non-manufacturers to act as car dealers was not discriminatory for dormant Commerce Clause purposes).

That means Michigan's Summer-Fuel Laws are not subject to heightened scrutiny. Instead, they need only pass *Pike*'s deferential test: the laws violate the dormant Commerce Clause only if their burden on foreign commerce is "clearly excessive" in relation to the benefits to Michigan. *See Int'l Dairy Foods*, 622 F.3d at 644.

On this point, Ammex says that it currently has no supply of 7.0 RVP gasoline and so if Wenk enforces the summer-fuel against it this summer, it cannot sell gas. And if that happens, Ammex avers that it will "lose substantial profits" not only from lost gasoline sales, but also from

"lost sales of other products that would have been purchased by the lost gasoline customers." (R. 29, PID 51–52.) And Ammex suggests that its contribution to Michigan's ozone is minimal given that cars burn the fuel they buy from Ammex in Canada and advances in vapor-capture technology. (*See* R. 14, PID 244–45.) In other words, Ammex thinks that the burden that the Summer-Fuel Laws place on foreign commerce is in clear excess of the benefits to Michigan.

The Court disagrees. Over the past five years, Michigan's 7.0 RVP standard imposed little burden on the foreign commerce at issue: Ammex was able to buy significant quantities of gas from a foreign supplier and sell significant quantities of gas to those leaving this country. True, it is likely that there will be a greater burden on that commerce this summer. But that is only because Ammex's foreign supplier of 7.0 RVP gasoline has a *temporary* problem with one its tanks. Save for the next three months then, Michigan's Summer-Fuel Laws have not significantly burdened foreign commerce and are not anticipated to in the future. And enforcing the Summer-Fuel Laws against Ammex benefits Michigan. An analyst with the Michigan Department of Environmental Quality avers that gas stations contribute to ground-level ozone formation when fuel is placed in the station's storage tanks and when people refuel their vehicles. (R. 13, PID 208.) A meteorologist with MDEQ avers that "[e]missions associated with fueling at Ammex's gas station will add additional ozone precursor to an area that already has ozone exceeding the" NAAQS for 8-hour ozone. (R. 13, PID 214.) On balance, the Court finds that the generally-minimal burden on foreign commerce imposed by the Summer-Fuel Laws does not "clearly" outweigh Michigan's interest in clean air.

So, properly raised or not, the Court finds that Ammex is not likely to show that the Summer-Fuel Laws fail *Brown-Forman*'s two-part test.

**2.**

Next, Ammex says that Michigan's Summer-Fuel Laws violate the Foreign Commerce Clause because the laws infringe on Congress' right to speak for the nation on matters of foreign commerce. (R. 8, PID 85–86.) To better understand this argument, it is helpful to review Ammex's sole authority on the issue: *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434 (1979).

In *Japan Line*, shipping containers passed through California as part of their "international journeys" and if they happened to be in the state on March 1, California levied a tax. 441 U.S. at 436–37. Because "[f]oreign commerce is pre-eminently a matter of national concern," *id.* at 447–48, the Supreme Court held that California's tax would be unconstitutional if it either "creat[ed] a substantial risk of international multiple taxation" or "prevent[ed] the Federal Government from speaking with one voice when regulating commercial relations with foreign governments." *Id.* at 451 (internal quotation marks omitted). Because "Japan ha[d] the right and the power to tax the containers in full," California's tax subjected the companies that owned the containers to multiple taxation "in fact." *Id.* at 452. And because the United States had signed a convention allowing containers to be temporarily imported into signatory countries free of duties and taxes, California's tax also prevented the "Nation from speaking with one voice in regulating foreign trade." *Id.* at 452–53 (internal quotation marks omitted).

Although not raised in its briefing, at oral argument Ammex claimed that the Summer-Fuel Laws failed the multiple-taxation prong of *Japan Line*'s test. In Ammex's view, the multiple-taxation test should be "reformulated" to a multiple-regulation test for purposes of this case. And Ammex says that the Summer-Fuel Laws expose it to multiple regulation because Canada does not have a 7.0 RVP standard for gasoline but Michigan does.

Even accepting Ammex's generalization of *Japan Line*'s multiple-taxation test, the situation Ammex confronts is materially different than the one that the container companies confronted. The container companies were "in fact" subject to taxes by both Japan and California and satisfying one demand did not (and could not) satisfy the other. Here, if Ammex sells gas that complies with Michigan's summertime RVP standard, it also satisfies Canada's summertime RVP standards. The burdens Canada and Michigan impose on Ammex are neither cumulative nor inconsistent.[2]

Ammex also claims that the Summer-Fuel Laws violate the "one voice" prong of *Japan Line*, i.e., if Michigan's 7.0 RVP standard were enforced against Ammex, it would prevent Congress from speaking for the nation on foreign trade.

To better understand Ammex's "one voice" argument, some additional background is necessary. In amending § 1555 to more formally and more specifically regulate duty-free stores, Congress found that duty-free stores "play a significant role in attracting international passengers to the United States." Pub. Law 100-418 (1988); *see also* S. Rep. 100-71 (1987) (providing that duty-free stores "induce foreign visitors to increase their expenditures for goods in the United States"). Congress also found that duty-free stores are an "important source of revenue for the State, local and other governmental authorities" because duty-free stores pay those authorities "concession fees." Pub. Law 100-418 (1988); *see also* 48 Fed. Reg. 33318 (July 21, 1983) (noting that "the duty-free store at Honolulu, Hawaii, contributes significantly to the State economy" and

---

[2] Ammex did present evidence indicating that if Michigan were to require that gasoline have a maximum RVP of 7.0 psi all year long, Michigan's maximum RVP requirement would conflict with Canada's minimum RVP requirement during the winter months. But that hypothetical conflict is highly unlikely to arise. It has been 12 years since Michigan modified its RVP requirements. And the whole point of the summer-fuel laws is that ozone formation is most likely on hot, sunny days (R. 13, PID 208)—days which are more than rare during a Michigan winter.

that "stores on the Mexican border impact correspondingly on local economies"). Congress also stated that the amendments were to "encourage uniformity and consistency of regulation of duty-free sales enterprises." Pub. Law 100-418 (1988). And, via 19 U.S.C. § 1557(a)(1), Congress has declared, "Any merchandise subject to duty (including international travel merchandise), with the exception of perishable articles and explosive substances other than firecrackers, may be entered for warehousing and be deposited in a bonded warehouse[.]" *See also Ammex, Inc. v. United States*, 24 C.I.T. 851, 856 (2000) (finding that U.S. Customs violated § 1557(a)(1) by prohibiting Ammex from selling gasoline).

In Ammex's view, via these pronouncements, Congress has declared a national foreign-trade policy of allowing duty-free stores to sell any goods that international travelers want to buy (save perishables and explosives) at prices that those travelers want to buy them at. And Michigan's Summer-Fuel Laws purportedly interfere with this declaration because they force Ammex to buy 7.0 RVP gasoline at higher costs than Canadian-compliant fuel, which, in turn, means that Ammex must sell gasoline at prices unattractive to international travelers. Or worse, in circumstances like the present, the Summer-Fuel Laws prevent Ammex from selling tax-free gasoline entirely.

As an initial matter, the Court does not understand § 1557(a)(1) to regulate at the level of granularity that Ammex thinks it does. Ammex reads § 1557(a)(1) as not only permitting it to sell every good (other than perishables and explosives) but every variety of every good. It is not enough that § 1557(a)(1) permits Ammex to sell gasoline, in Ammex's view the statute permits it to sell Canadian-compliant gasoline. But the statute speaks of classes of goods (perishables) not specific goods (strawberries) let alone a specific variety of a specific good (California strawberries). The Court acknowledges that the Court of International Trade has stated, "the plain language of

§ 1557(a)(1) shows Congress' intent that there be only two restrictions on the *type* of dutiable merchandise that may be stored or withdrawn from a bonded warehouse: (1) perishable articles and (2) explosive substances other than firecrackers." *Ammex*, 24 C.I.T. at 854–55 (emphasis added). But read in context, the word "type" refers to a class of goods ("perishable articles" and "explosive substances").

A hypothetical leads to a similar reading of § 1557(a)(1). If a statute said, "any vehicles, with the exception of military vehicles, may be sold at a car dealership," no one would think that the statute authorizes car dealers to sell vehicles without legally-required safety features (e.g., airbags). *See* 49 C.F.R. § 571.208; 49 C.F.R. § 571.101 *et seq*. That is, if a car dealer sold cars without airbags, it would be no defense for the dealership to say, "but the law says that 'any vehicles, with the exception of military vehicles, may be sold at a car dealership' and cars without airbags are a type of vehicle."

Here, the Summer-Fuel Laws do not preclude Ammex from selling a good. It may sell gasoline. The Summer-Fuel Laws at most preclude Ammex from selling a variety of gasoline, namely gasoline with a RVP above 7.0 psi. Or, viewed slightly differently, the Summer-Fuel Laws are like the airbags in the hypothetical, they ensure that a good meets a certain quality or safety standard. Either way, the Summer-Fuel Laws are not contrary to what Congress has said in § 1557(a)(1).

But Ammex stresses that in this case, regulating a good is the same as prohibiting its sale. More specifically, because Ammex presently has no foreign source of 7.0 RVP gasoline, an effect of the Summer-Fuel Laws is to prohibit Ammex from selling gasoline this summer.

The Court is not persuaded by Ammex's regulation-is-prohibition argument. As explained, whether Michigan's Summer-Fuel Laws can be constitutionally applied to Ammex should not turn

on whether Ammex has a temporary supply problem. It would be more than odd to say that Wenk does not violate the Commerce Clause by enforcing the Summer-Fuel Laws when Ammex can readily obtain 7.0 RVP gasoline from a foreign source (say, last summer), but he does when Ammex cannot (this summer). Stated differently, the Summer-Fuel Laws are in no way directly contrary to Congress' foreign-trade policy; they only indirectly affect that policy in uncommon circumstances. *Cf. Japan Line*, 441 U.S. at 452–53 (finding state tax unconstitutional where state tax on containers temporarily in the United States was directly contrary to foreign-trade policy of not taxing containers temporarily in the United States). As such, the Court does not find that the Summer-Fuel Laws unlawfully interfere with what Congress has said in § 1557(a)(1).

Similar reasoning applies to Congress' goal of attracting international travelers to the United States, Pub. Law 100-418 (1988), and inducing those travelers to spend more money in this country, S. Rep. 100-71 (1987). For the past five years, Ammex has been able to sell gasoline. And Ammex has sold gasoline at prices attractive to travelers from Canada despite complying with the Summer-Fuel Laws. This is evidenced by the fact that Canadian travelers have the option of stopping at a Canadian gas station just across the Ambassador Bridge but frequently stop at Ammex instead. Indeed, while not all its sales are to Canadians, Ammex sells 400,000 gallons of fuel a month. That the Summer-Fuel Laws may, in combination with other factors, result in Ammex not selling duty-free gasoline for one summer, does not show that the laws "substantial[ly]," *Japan Line*, 441 U.S. at 456 n.20, interfere with Congress' aims of increasing visits from and spending by foreign travelers.

As for concession fees, Ammex has not shown that the amount it pays to Michigan in concession fees is tied to the amount of gasoline it sells. Ammex has argued that if it is forced to sell gasoline at unattractive prices or not at all, it will pay less in single-business tax to Michigan.

*See Ammex, Inc. v. Dep't of Treasury*, 732 N.W.2d 116, 124–25 (Mich. Ct. App. 2007) (providing that Michigan's single-business tax is based in part on sales). But, as discussed, Ammex has been able to sell 400,000 gallons of gasoline in a month despite complying with the Summer-Fuel Laws. And Ammex's short-term inability to sell gasoline does not convince the Court that the Summer-Fuel Laws are contrary to duty-free stores' role in generating revenue for the state. Moreover, the Court is not convinced that Ammex would be unable to sell gasoline this summer if Wenk enforced the 7.0 RVP standard against it. Rather it appears that if Ammex obtained 7.0 RVP gasoline from a domestic source, it could still sell gasoline this summer, albeit not tax free. *See* 19 U.S.C. § 1555(b)(5); 19 C.F.R. § 19.36(e)(2).

That leaves uniformity. Ammex claims that by amending § 1555(b) to "encourage uniformity and consistency of regulation of duty-free sales enterprises," Pub. Law 100-418 (1988), Congress indicated that all duty-free stores should be able to sell the same goods. Ammex says that if states were able to regulate goods, duty-free stores would be subject to a "patchwork" of state regulations.

Ammex's argument adds words to Congress' finding. In amending § 1555, Congress found that there was "a need to encourage uniformity and consistency of regulation of duty-free sales enterprises." Congress did not find that there was "a need to encourage uniformity and consistency of regulation *of goods that can be sold* at duty-free sales enterprises."

And the history of duty-free stores further suggests that Congress was referring to uniformity in the operations of duty-free stores rather than the goods they are able to sell. In 1983, U.S. Customs explained that it had been regulating duty-free stores "as part of its overall bonded warehouse program" but "the special nature of the stores and their procedures ha[d] become increasingly difficult to 'contain' within the other categories of bonded warehouses." *See* 48 Fed.

Reg. 33318 (July 21, 1983). One possible solution was to "provide for a comprehensive incorporation of duty-free store operating procedures into the Customs Regulations, beginning with Customs formal recognition, and specific designation of the duty-free store as a new class of Customs bonded warehouse." *Id.* Seven years later, Customs explained that it still had been regulating duty-free stores through "administrative directives, rather than through any specific law or regulation." 56 Fed. Reg. 22833 (May 17, 1991). And while Customs had (as it contemplated in 1983) drafted regulations specific to duty-free stores, those "regulations were never published" because Congress had "prohibit[ed] the use of Customs funds . . . to propose or promulgate any rules or regulations relating to duty-free stores until Congress legislated in the matter." *Id.* That did not happen until 1988, when Congress amended § 1555 and found that "there is inadequate statutory and regulatory recognition of, and guidelines for the operation of duty-free sales enterprises" and "there is a need to encourage uniformity and consistency of regulation of duty-free sales enterprises." Pub. Law 100-418 (1988). Thus, the history of regulation of duty-free stores suggests that Congress was not referring to uniformity in the goods that duty-free stores were able to sell, but uniformity in the operations of duty-free stores.

In short, Ammex has not shown that Michigan's Summer-Fuel Laws violate the Foreign Commerce Clause because they subject Ammex to multiple regulation or because they infringe on Congress' right to speak for the nation on matters of foreign commerce. *See Japan Line*, 441 U.S. at 451.

### 3.

Finally, Ammex says that the Summer-Fuel Laws violate the extraterritoriality branch of the dormant Foreign Commerce Clause.

In *Healy v. Beer Institute*, 491 U.S. 324 (1989), the Supreme Court reviewed its prior decisions "concerning the extraterritorial effects of state economic regulation" and set out a number of "propositions." *Id.* at 336. "First," said the Court, "the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Id.* at 336 (internal quotation marks and ellipses omitted). "Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id.* at 336. "The critical inquiry," the Court said, is whether the "practical effect" of the State's law is "to control conduct beyond the boundaries of the State." *Id.* This led to the third proposition: "the practical effect of the statute must be evaluated" by considering "the consequences of the statute itself," "how the challenged statute may interact with the legitimate regulatory regimes of other States," and "what effect would arise if not one, but many or every, State adopted similar legislation." *Id.*

Ammex thinks these propositions apply squarely to this case because "[i]n both the legal and factual sense," its gasoline sales "never touch the domestic stream of commerce." (R. 8, PID 84.) Ammex points out it buys gasoline from a foreign supplier or one located in a foreign trade zone. (R. 29, PID 848–49.) And Ammex points out that under the regulations governing duty-free shops, the merchandise it sells is for use outside the United States. (R. 8, PID 84.) In fact, Ammex says, "[t]he geography of the Ammex Facility offers no direct physical route for products stored or sold at the store to enter the United States. Thus, cars entering the gas station must proceed into Canada upon exit." (R. 8, PID 84.) Therefore, in Ammex's view, its gasoline sales "occur[] entirely outside" of Michigan. (R. 8, PID 85.) And because Michigan's Summer-Fuel Laws regulate the

gasoline it sells, the Summer-Fuel Laws impermissibly regulate commerce outside of Michigan. (*Id.*)

Although Ammex presents a compelling argument, the Court is not persuaded that the extraterritoriality doctrine applies to the facts of this case.

As an initial matter, the doctrine should not be readily applied. In the Supreme Court, the extraterritoriality doctrine has only been used to strike down state laws on three occasions. *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015). And each time, the law was a price-affirmation statute (e.g., a state law requiring a wholesaler to affirm he was not giving retailers in neighboring states a better deal). *See Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013). Indeed, writing for the Tenth Circuit, Judge-now-Justice Gorsuch called extraterritoriality "the most dormant doctrine in dormant commerce clause jurisprudence," classified *Healy*'s three "propositions" as "dicta," and effectively limited the extraterritoriality doctrine to cases involving "a price control or price affirmation regulation" that linked "in-state prices to those charged elsewhere" with "the effect of raising costs for out-of-state consumers or rival businesses." *Epel*, 793 F.3d at 1170, 1173, 1174. And Judge Sutton of our appellate court has persuasively argued why the doctrine is a "relic of the old world with no useful role to play in the new." *See Am. Beverage*, 735 F.3d at 378–79 (Sutton, J., concurring). None of this is to say that the extraterritoriality doctrine no longer exists—but it is to say that this Court should be circumspect in applying it.

Second, Wenk would not contravene the concepts animating the extraterritoriality doctrine if he were to enforce the Summer-Fuel Laws against Ammex. The doctrine stems from three Founding Era concepts: (1) a state's regulatory power ends at its borders; (2) respect for other states' sovereignty; (3) respect for the federal government's sovereignty. *See Am. Beverage*, 735

F.3d at 377 (Sutton, J., concurring). An examination of these three concepts reveals that the extraterritoriality doctrine is an ill fit for the facts of this case.

Regarding regulatory reach, Michigan is in one sense regulating beyond its borders but, in another, not at all. True, the gasoline Ammex purchases comes from a foreign country or foreign trade zone, is stored beyond CBP's "exit point" from the United States, and is taken to Canada immediately after purchase. But even under CBP's definition of "exit point" (and it is by no means a given that CBP's definition should be controlling for purposes of the Foreign Commerce Clause), Ammex is still within the United States and thus, within Michigan. *See* 19 C.F.R. §§ 19.1(a)(9), 19.35(d). And Ammex concedes that it must comply with other Michigan laws that affect its ability to engage in commerce, such as Michigan employment laws, building permits, and even, possibly, permits relating to its gasoline storage tanks. *See Ammex, Inc. v. Dep't of Treasury*, 732 N.W.2d 116, 126 (Mich. Ct. App. 2007) ("[W]e conclude that Ammex's duty-free facilities are located within this state and that Ammex enjoys the privilege of utilizing Michigan's resources. . . . Michigan retains a governmental interest for matters related to zoning, police powers, and regulatory approval."). Indeed, federal law provides that duty-free stores must obtain a "concession or approval" from state or local government authority whenever that authority, "incident to its jurisdiction over any . . . exit point facility, requires that a concession or other form of approval be obtained from [it] with respect to the operation of a duty-free store." 19 C.F.R. § 19.35(g). Moreover, although focused on commerce, *Healy* also directed courts to ask whether the "practical effect" of the state's law is "to control *conduct* beyond the boundaries of the State." 491 U.S. at 336 (emphasis added). And depositing fuel into Ammex's storage tanks and then pumping fuel from those tanks into vehicles are two acts that occur within Michigan's borders. So Michigan is arguably regulating within—not beyond—its borders.

The extraterritoriality doctrine's other two concerns—a state infringing on the sovereignty of other states (or, here, foreign governments) and a state infringing on the sovereignty of the federal government—are even more plainly not implicated in this case.

Starting with foreign governments, the fuel laws do not prevent Canada (or Ontario) from setting any RVP for gasoline that it wishes. Nor does it prevent any Canadian business (or any business for that matter) from selling gasoline in Canada that does not comply with Michigan's 7.0 RVP standard.

In this way, Michigan's Summer-Fuel Laws are like Ohio's labeling laws in *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628 (6th Cir. 2010)—a case where the Sixth Circuit found no violation of the extraterritoriality doctrine. There, Ohio forced businesses to label dairy products sold in Ohio in a particular manner. *Id.* at 633–34. But the businesses were free to ignore Ohio's labeling law when selling the same dairy products in other states. *Id.* at 647. A business could sell products in say, Indiana, that complied with Ohio's labeling laws or not. Ohio's laws did not dictate the choice. *Id.* at 647. A similar situation exists here. A business can sell gasoline in Canada that complies with Michigan's Summer-Fuel Laws or not. Michigan's Summer-Fuel Laws do not dictate the choice.

That leaves the possibility that the Summer-Fuel Laws infringe upon the sovereignty of the federal government. As explained above in addressing Ammex's "one voice" argument, Michigan's Summer-Fuel Laws do not substantially limit a duty-free store's ability to "attract[] international passengers to the United States," Pub. Law 100-418 (1988), or to "induce foreign visitors to increase their expenditures for goods in the United States," S. Rep. 100-71 (1987). Nor does it contravene Congress' statement in 19 U.S.C. § 1557(a)(1) that "[a]ny merchandise subject to duty (including international travel merchandise), with the exception of perishable articles and

explosive substances other than firecrackers, may be entered for warehousing and be deposited in a bonded warehouse[.]" Moreover, the federal government has arguably authorized Michigan to enforce the Summer-Fuel Laws against Ammex: the EPA has found that Michigan's 7.0 RVP standard is "necessary" to achieve national air-quality standards, 72 Fed. Reg. 4432, 4434 (Jan. 31, 2007), and the EPA intended RVP requirements to "fully cover the introduction of gasoline into motor vehicles," *see* 54 Fed. Reg. 11868, 11871–72 (Mar. 22, 1989).

In short, Ammex not only invites the Court to invoke the "most dormant" dormant Commerce Clause doctrine to bar Wenk's enforcement of the Summer-Fuel Laws, it asks the Court to do so when one of the three concepts animating the doctrine must be stretched to fit this case and the other two just do not fit. The Court declines the invitation.

That decision is not inconsistent with *American Beverage*, the only case in which the Sixth Circuit has applied the extraterritoriality doctrine to strike down a state law. In that case, the Michigan law at issue essentially went a step further than the Ohio law at issue in *Int'l Dairy Foods*: Michigan not only required beverage manufactures to place their drinks in bottles with a unique Michigan mark (like the Ohio law), it prohibited those bottles from being sold in any other state that did not have a similar marking law (unlike the Ohio law). *See id.* at 367, 374–75. Thus, there was concern that Michigan's law would adversely "'interact with the legitimate regulatory regimes of other States'" or that an adverse "'effect would arise if not one, but many or every, State adopted similar legislation.'" *See id.* at 376 (quoting *Healy*, 491 U.S. at 336). Indeed, the Sixth Circuit found that "other states must react today to Michigan's unique-mark requirement or also face legal consequences." *Id.* at 376; *see also id.* at 382 (Rice, J., concurring) ("Under the circumstances presented here, whether or not manufacturers are, in fact, subject to inconsistent labeling requirements, the potential for havoc certainly exists.").

The same concerns are not present here. The Summer-Fuel Laws will not adversely "interact with the legitimate regulatory regimes of other [sovereigns]." As explained, there is no conflict between Canada's existing RVP standards and Michigan's existing RVP standards. And the Summer-Fuel Laws do not conflict with any RVP standard set by the federal government. Nor would "havoc" or a perverse effect arise if other sovereigns implemented RVP standards similar to the one set in the Summer-Fuel Laws. If Canada were to set a maximum RVP standard, Ammex could comply with the lower of Michigan's and Canada's standards. And the same is true if the EPA were to set a maximum RVP standard different than Michigan's. Accordingly, the Court finds that *American Beverage* does not require this Court to find Michigan's Summer-Fuel Laws unconstitutional under the extraterritoriality doctrine.

* * *

In sum, Ammex has not shown that the Summer-Fuel Laws fail *Brown-Forman*'s discrimination test, *Japan Line*'s multiple-taxation and "one voice" tests, or *Healy*'s extraterritoriality test. As such, Ammex is not likely to succeed in showing that the dormant Foreign Commerce Clause bars Wenk from enforcing the Summer-Fuel Laws against it.

### C.

The Court thus turns to Ammex's two preemption claims. Because federal law is "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, state laws can be trumped by federal ones. Congress' intent to preempt state law can be manifested in several ways. *See United Automotive Workers, Local 3047 v. Hardin Cty., Kentucky*, 842 F.3d 407, 418 (6th Cir. 2016). One way is when Congress "creates a scheme of federal regulation" that is "so pervasive" it is reasonable to infer "that Congress left no room for the States to supplement it." *Id.* A state law is also preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress." *Id.* Ammex claims that Congress preempted the Summer-Fuel Laws in each of these two ways. (R. 8, PID 81.)

The Court begins with Ammex's field-preemption claim and then turns to its conflict-preemption claim. In doing so, the Court is mindful that there is a "strong presumption against federal preemption of state law." *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015).

## 1.

Ammex argues, "If Congressional regulation is so pervasive that it occupies the field on state taxation of bonded goods for export, then this principle applies with added force to preempt state efforts to regulate the *type* of goods sold, such as gasolines with various octanes, additives, or vapor pressures." (R. 8, PID 81.) In Ammex's view, the Summer-Fuel Laws are even "more invasive" than state taxation, and so if Congress has regulated customs bonded warehouses to the point where state taxes cannot intrude, it must be that there is no room for Michigan to impose a 7.0 RVP requirement on gasoline stored at a customs bonded warehouse. (*See* R. 8, PID 81.)

As an initial matter, the Court is not entirely convinced that any court has held that Congressional regulation of customs bonded warehouses is so pervasive that there is no room for states to tax bonded goods for export. Among Ammex's authorities, *Xerox Corp. v. Harris Cty., Tex.*, 459 U.S. 145 (1982), seems to be the closest to having so held. There, the Court found that the regulations governing how photocopiers were imported to, stored in, and exported from customs bonded warehouses were "pervasive" and held that "state property taxes on goods stored under bond in a customs warehouse [were] preempted by Congress's comprehensive regulation of customs duties." *Id.* at 154. But the Court in *Xerox* also said that its analysis in *McGoldrick v. Gulf Oil Corp.*, 309 U.S. 414 (1940), "applie[d] with full force" to the facts before it. 459 U.S. at 153.

And *McGoldrick* rested much more on conflict-preemption principles than field-preemption principles. *See McGoldrick*, 309 U.S. at 427, 429 (finding that in allowing petroleum to be imported into and exported from a customs bonded warehouse without payment of duties, Congress intended "to enable American refiners to meet foreign competition" and that a state tax on the petroleum would cause Congress' "purpose" to "fail"). Moreover, in *Xerox*, the Court found that a state tax on photocopiers stored in a customs bonded warehouse and destined for export would undermine Congress' goal in allowing the photocopiers to be stored duty free. *Xerox Corp.*, 459 U.S. at 153. Thus, *Xerox* also arguably rested more on conflict-preemption principles than field-preemption principles. At a minimum, it is unclear whether any court has held, as Ammex suggests, that Congressional regulation of customs bonded warehouses is so pervasive that there is no room for states to tax bonded goods for export. *Cf. R.J. Reynolds Tobacco Co. v. Durham Cty., N.C.*, 479 U.S. 130, 149 & n.19 (1986) (finding that regulations governing customs bonded warehouses "while detailed, appear to contemplate some concurrent state regulation and, arguably, even state taxation"). And the primary case that Ammex relies on found that "the United States Supreme Court has clearly held that the federal scheme regulating customs bonded warehouses does not evince a congressional intent to preempt state regulation by occupying the entire field." *Ammex, Inc. v. Dep't of Treasury*, 726 N.W.2d 755, 763 (Mich. Ct. App. 2006).

But even granting Ammex its premise, its conclusion does not necessarily follow. That is, even if Congress has left no room for states to impose taxes on goods stored in customs bonded warehouses and destined for export, it does not follow that there is no room for states to regulate those goods. Ammex believes that the Summer-Fuel Laws are even more invasive than a state tax, but a state tax goes to the very core of Congress' regulation of bonded warehouses. Congress has specifically legislated that a merchant may store goods at customs bonded warehouses and defer

import duties until the goods are placed into the stream of U.S. commerce or not pay them at all if exported to foreign country. *See* 19 U.S.C. § 1557(a)(1); *Xerox*, 459 U.S. at 150–51 & n.7. Because Congress has clearly occupied the field of import duties on goods entered into bonded warehouses, it arguably follows that it has occupied the field of taxes on goods stored in bonded warehouses and destined for export. Taxes and duties are cousins. But regulations on the quality or safety of good, or a prohibition on one variety of good, are more afield. So simply because there is no room for state taxes on goods stored in customs bonded warehouses and destined for export, does not mean that there is no room for Michigan's Summer-Fuel Laws.

At oral argument, Ammex did not focus on this *a fortiori* argument (i.e., state taxes are field preempted and so more intrusive regulations are field preempted). Instead, Ammex argued that while there may be room for Michigan to regulate certain aspects of customs bonded warehouses, Congress had completely regulated the set of goods that may be sold at a customs bonded warehouse. In support of this claim, Ammex directed the Court to *Ammex, Inc. v. United States*, 24 C.I.T. 851 (2000). Recall, in that case, the Court of International Trade stated that "the plain language of § 1557(a)(1) shows Congress' intent that there be only two restrictions on the type of dutiable merchandise that may be stored or withdrawn from a bonded warehouse: (1) perishable articles and (2) explosive substances other than firecrackers." *Id.* at 854–55 ("[T]he plain language of § 1557(a)(1) makes [diesel fuel and gasoline] eligible for sale from duty-free stores.").

The Court has effectively addressed Ammex's preemption argument based on *Ammex v. United States*. In finding that the Summer-Fuel Laws do not infringe on Congress' voice, this Court found that because the Summer-Fuel Laws merely regulated gasoline or dictated that Ammex sell a variety of gasoline, they were not inconsistent with § 1557(a)(1). And, in responding to Ammex's

assertion that the Summer-Fuel Laws go further, i.e., that they prohibit the sale of gasoline, the Court found that the constitutionality of the Summer-Fuel Laws should not turn on Ammex's short-term supply problem. Accordingly, even if Congress dictated which goods may be sold at a duty-free store when it enacted § 1557(a)(1), the Court finds that Congress left room for Michigan to impose a volatility standard on gasoline sold at a duty-free store.

## 2.

That leaves Ammex's claim that if the Summer-Fuel Laws were enforced against Ammex, it would frustrate Congress' goals for duty-free stores. Ammex argues that if Wenk were permitted to enforce the Summer-Fuel Laws against it, the "direct effect" would be "precluding Ammex from selling Canadian-compliant gasoline—which is the product naturally desired by customers proceeding to Canada—during the summer months." (R. 8, PID 81; *see also* R. 14, PID 258.) "Therefore," says Ammex, "the Summer Fuel Requirements plainly stand as an obstacle to the purposes of the federal customs law." (R. 14, PID 258; *see also* R. 8, PID 81.)

The Court disagrees. As discussed, in providing more formal and more comprehensive regulation of duty-free stores, Congress found that duty-free stores attracted international travelers to the United States and found that duty-free stores provided revenue (in the form of concession fees) to the states. *See* Pub. Law 100-418 (1988). And Congress sought to "encourage uniformity and consistency of regulation of duty-free sales enterprises." *Id.* Further, via § 1557(a)(1), Congress provided that duty-free stores may sell any goods save for perishables and most explosives. For essentially the same reasons that the Summer-Fuel Laws do not infringe on what Congress has said on behalf of the Nation on a matter of foreign commerce, the Summer-Fuel Laws do not frustrate Congress' findings relating to and objectives for duty-free stores. For each of the past five years, Ammex has been able to purchase large quantities of gasoline from a foreign

supplier and sell large quantities of gasoline to Canadian travelers despite complying with the Summer-Fuel Laws. And, as explained, the Summer-Fuel Laws do not prohibit Ammex from selling any good. And, consistent with the purpose of customs bonded warehouses generally (as opposed to duty-free stores specifically), they certainly do not prohibit Ammex from selling any good duty free and tax free. It is only in the temporary and uncommon circumstance where Ammex does not have a foreign supply of 7.0 RVP gasoline, that the Summer-Fuel Laws have the indirect effect of prohibiting the sale of tax-free gasoline at duty-free store. (Again, the Summer-Fuel Laws apparently do not preclude Ammex from selling taxed gasoline. *See* 19 C.F.R. § 19.36(e)(2).) As such, the Court finds that the Summer-Fuel Laws do not frustrate Congress' findings set out in Public Law 100-418 or its objective in enacting § 1557(a)(1).

* * *

In sum, Ammex is not likely to show that federal laws governing customs bonded warehouses are so pervasive that they left no room for an application of Michigan's Summer-Fuel Laws or that the Summer-Fuel Laws are an "obstacle" to Congress' goals for duty-free stores.

## V.

Because Ammex is not likely to succeed on the merits, the Court does not address the other preliminary injunction factors. *See Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 615 (6th Cir. 2018) ("[A] preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." (internal quotation marks omitted)); *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) ("'Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.'" (quoting *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000)).

## VI.

For the reasons provided, Ammex's motion for preliminary injunction (R. 8) is DENIED.

SO ORDERED.

                                    s/Laurie J. Michelson
                                    LAURIE J. MICHELSON
Dated: June 1, 2018                 U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 1, 2018.

                                    s/Keisha Jackson
                                    Case Manager