AMMEX, INC.,

       Plaintiff,

v.

GARY MCDOWELL, *in his capacity as Director, Michigan Department of Agriculture & Rural Development*,

       Defendant.

Case No. 2:18-cv-10751
Honorable Laurie J. Michelson

## OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION TO DISMISS [50]

A law says gas stations in southeast Michigan, including Wayne County, must sell a lower-vapor gasoline during the summer. Ammex, Inc. operates a gas station in Wayne County. So the law appears to apply to Ammex.

But Ammex thinks appearances can be deceptive. It points out that its gas station is uniquely located within Wayne County: at the base of a bridge to Canada. Further, Ammex asserts that it sources gas from a foreign country (or a foreign trade zone), that it keeps the gas behind what federal customs laws deem the "exit point" from the United States, and that the cars that refuel at its station can only exit onto the bridge to Canada. In other words, for federal customs purposes, the gasoline never enters domestic commerce. Further, in Ammex's view, its gas station is within the exclusive jurisdiction of the United States Customs and Border Protection and the lower-vapor gasoline law was not promulgated by that federal agency.

For these and related reasons, Ammex believes that the law requiring it to sell lower-vapor gasoline in the summer cannot be enforced against it. The Michigan Department of Agriculture

and Rural Development, the agency in Michigan tasked with enforcing the law, sees things differently. Ammex thus filed this declaratory-judgment action asking the Court to say who is correct. In this Court's opinion, MDARD has the better view. So the Court will GRANT its motion to dismiss.

## I.

## A.

To understand how this dispute came to be, and to appreciate the legal determinations made so far in this case on Ammex's earlier motion for preliminary injunction, it is necessary to say a bit about the role of the states under the Clean Air Act.

In 1970, dissatisfied "with earlier efforts at air pollution abatement," Congress made major changes to the Clean Air Act. *Friends of the Earth v. Carey*, 535 F.2d 165, 168–69 (2d Cir. 1976). In particular, Congress directed the Environmental Protection Agency to establish National Ambient Air Quality Standards. *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 65 (1975). But Congress did not intend the EPA to battle air pollution alone; instead, it directed each state to submit a plan—known as a state implementation plan, or SIP—for implementing, maintaining, and enforcing the national air-quality standards. *See id.*; 42 U.S.C. § 7410(a)(1). The states' implementation plans were subject to EPA approval, as were any post-approval changes to the plans. *See N. Ohio Lung Ass'n v. E.P.A.*, 572 F.2d 1143, 1147 (6th Cir. 1978). That is still true today. *See* 42 U.S.C. § 7410(k), (*l*).

In 1990, Congress again made major changes to the Clean Air Act. For one, Congress set a national Reid vapor pressure (RVP) standard for gasoline. *See* 42 U.S.C. § 7545(h). In particular, Congress directed the EPA to promulgate regulations prohibiting anyone from selling—or even "dispens[ing]"—gasoline with an RVP higher than 9.0 pounds per square inch. *See* 42 U.S.C.

§ 7545(h)(1), (6). Congress prohibited a state from holding gasoline to a different RVP standard, *see* 42 U.S.C. § 7545(c)(4)(A)(ii), unless the EPA both found the state's RVP standard was "necessary" to meet national standards and approved the deviation as part of the state's implementation plan, *see* 42 U.S.C. § 7545(c)(4)(C)(i); 71 Fed. Reg. 46879, 46880 (Aug. 15, 2006).

In 2004, the EPA designated eight counties in southeast Michigan—including Wayne County—as not attaining the standards for ozone. 71 Fed. Reg. 46879, 46880 (Aug. 15, 2006). In this opinion, the Court will refer to the eight counties as "Southeast Michigan."

In response to the nonattainment designation, Michigan enacted House Bill 5508. (*See* ECF No. 18-33, PageID.536–542.) Section 10d of HB 5508 provided, "Beginning June 1 through September 15 of 2007 and for that period of time each subsequent year, the vapor pressure standard shall be 7.0 psi for dispensing facilities in Wayne [and seven other Southeast Michigan] counties." (ECF No. 18-33, PageID.542.) And section 2(j) of HB 5508 defined "dispensing facility" as "a site used for gasoline refueling." (ECF No. 18-33, PageID.537.) (Sections 10d and 2(j) of HB 5508 are now found at Michigan Compiled Laws § 290.650d and § 290.642(m), respectively.)

As noted, the 1990 amendments to the Clean Air Act set a national 9.0 RVP standard for gasoline and prohibited states from setting a different standard unless the EPA found that a different standard was "necessary" and the EPA approved the deviation as part of the state's implementation plan. So Michigan asked the EPA to approve a revision to its state implementation plan to incorporate HB 5508. (*See* ECF No. 18-33, PageID.529.)

In 2007, the EPA granted Michigan's request. The EPA found that the 7.0 RVP standard was "necessary" to achieve the national air quality standard for ozone. 72 Fed. Reg. 4432, 4433 (Jan. 31, 2007); *see also* 71 Fed. Reg. 46879, 46881 (Aug. 15, 2006). And the EPA approved the

provisions of HB 5508, including § 10d, as part of the Michigan's implementation plan. 72 Fed. Reg. 4432, 4434 (Jan. 31, 2007). The EPA further amended the Code of Federal Regulations to "incorporat[e] by reference" "House Bill 5508." *Id.* at 4435.

## B.

Ammex operates a gas station in Wayne County, one of the eight counties subject to § 10d of HB 5508. But the gas station is uniquely situated in Wayne County: it sits right before the Ambassador Bridge to Canada and those stopping at the station are, by the station's physical design, directed onto the bridge after refueling. (ECF No. 49, PageID.1207 ¶¶ 5, 35.) Indeed, the gas station is beyond what the United States Customs and Border Protection defines as the "exit point," i.e., the point where a person has "no practicable alternative" but to exit the United States and continue into Canada. *See* 19 C.F.R. § 19.35(d). Still, Ammex's customers fill their gas tanks within the confines of Wayne County, Michigan.

## C.

In the summer of 2012, the Michigan Department of Agriculture and Rural Development, the state agency tasked with enforcing § 10d of HB 5508, *see* HB 5508 § 9h, tested gasoline at Ammex's station and found that the gasoline's RVP was more than 7.0 psi. MDARD issued a stop-sale order and filed an enforcement suit in state court. Ammex and MDARD settled that dispute. And for the next five summers (through summer 2017), Ammex sold gas that complied with § 10d.

But in the months leading up to the summer of 2018, Ammex ran into a problem. Ammex's gas station is part of a duty-free store. That means that so long as Ammex complies with certain federal laws governing duty-free stores, an import duty is not imposed on the goods it sells and Ammex is able to sell its goods both duty-free and tax-free. *See* 19 U.S.C. § 1555(b)(8)(D), (E); *Ammex, Inc. v. Dep't of Treasury*, 726 N.W.2d 755, 766–69 (Mich. Ct. App. 2006). And that means

that the gas at Ammex's store is cheaper than gas at nearby stations. But to sell gas duty-free and tax-free, Ammex must obtain the gas from a foreign country or a foreign trade zone and keep the gas beyond the CBP-defined "exit point." In the months preceding the summer of 2018, Ammex's foreign source for 7.0 RVP fuel had a problem with one of its tanks; so it would not be able to supply Ammex with gas in the summer of 2018. While there were other sources of 7.0 RVP fuel (after all, every gas station in Southeast Michigan must sell 7.0 RVP fuel in the summer), those sources were not foreign.

So Ammex faced three undesirable choices. One option was to obtain 7.0 RVP fuel from a domestic source and forgo duty-free and tax-free status; this would have allowed Ammex to comply with § 10d but would have stripped Ammex of its competitive advantage and, possibly, cost Ammex its duty-free status entirely. A second option was to sell foreign-sourced fuel with an RVP higher than 7.0 psi; this would have allowed Ammex to maintain its competitive advantage (and not jeopardize its duty-free status) but would have risked an enforcement action by MDARD and a penalty of $10,000 for each day of non-compliance with § 10d. *See* HB 5508 §§ 5(4), 5(10), 9h(1)(e) (materially identical language codified at Mich. Comp. Laws §§ 290.645(4), 290.645(10), 290.649h(1)(3), respectively). A third option was to shut down the gas station for the summer and incur losses from not selling gasoline and from not selling the goods that people buy from the duty-free store when stopping for gas (after all, who can resist an Icee on a hot summer's day?).

## D.

Faced with these difficult options, Ammex filed this declaratory-judgment action against MDARD. (Although the suit was filed against MDARD's director in his official capacity, such suits are effectively against the government agency. *See Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008).) Ammex asserted that application of Section 290.650d of the Michigan Compiled

Laws—the place where HB 5508 § 10d is codified—to its gas station violated two provisions of the U.S. Constitution.

To be more specific, Ammex's complaint had two counts. Count I asserted that MDARD's enforcement of § 290.650d against Ammex, because it interfered with Ammex's ability to sell gasoline to those headed to Canada, violated the dormant Foreign Commerce Clause. (ECF No. 1, PageID.12–14.) Count II was pursuant to the Supremacy Clause: Ammex claimed that as applied to it, § 290.650d was preempted by federal laws governing duty-free stores. (ECF No. 1, PageID.14–15.)

Not only did Ammex ask this Court for relief, it asked this Court for immediate relief. Because summer 2018 was fast approaching and its foreign supplier of 7.0 RVP fuel was not close to fixing its tank, Ammex asked this Court to preliminarily enjoin MDARD from enforcing § 10d against it. (ECF No. 8.)

After extensive briefing and oral argument, on June 1, 2018, the Court denied Ammex's motion for preliminary relief. *See generally Ammex, Inc. v. Wenk*, 326 F. Supp. 3d 472, 475 (E.D. Mich. 2018). The Court thought that there was a good chance that the provisions that made up HB 5508, including § 10d, were federal regulations: "the EPA required Michigan to lower ozone and the only feasible plan included a 7.0 RVP standard, it appears that Michigan's enactment of that standard had no legal effect unless and until the EPA found it 'necessary,' and the 7.0 RVP standard remains the law unless and until the EPA says otherwise." *Id.* at 485. Thus, this Court remarked, "short of the EPA actually promulgating [§ 10d], how could it be more federal?" *Id.* And if the provisions of HB 5508 were federal law, then it would follow that Ammex was not entitled to preliminary relief. After all, federal law does not preempt other federal laws; so that would nix Ammex's Supremacy Clause arguments. And the dormant Foreign Commerce Clause

jurisprudence cited by Ammex was concerned about state interference with Congress' plenary authority to regulate commerce with other countries—it did not concern itself with laws promulgated by federal agencies. Still, the Court did not ultimately hold that the provisions of HB 5508 were federal regulations. *See id.* at 485–86. The Court demurred in part because it thought that if it held that § 10d of HB 5508 was a federal regulation effectively promulgated by the EPA, Ammex would then seek preliminary relief on the ground that the promulgating agency, the EPA, had stated that RVP standards do not apply to gasoline exporters. *See id.* at 486 & n.1 (noting that this new argument might require joining the EPA to the suit).

So the Court instead directly addressed Ammex's arguments pursuant to the dormant Foreign Commerce Clause and the Supremacy Clause. There is no need to summarize that rather involved analysis here. It suffices to say that the Court found that Ammex was not likely to succeed in showing that § 290.650d as applied to Ammex was preempted by federal customs laws or that MDARD's enforcement of § 290.650d against Ammex infringed on Congress' authority to regulate commerce with Canada. *See Ammex*, 326 F. Supp. 3d at 486–98. So the Court denied Ammex preliminary relief.

Ammex appealed.

## E.

In August 2019, the Sixth Circuit affirmed this Court's denial of preliminary relief. *See generally Ammex, Inc. v. Wenk*, 936 F.3d 355 (6th Cir. 2019). In particular, the majority found that § 10d of HB 5508 was a federal law. Judge White, writing the majority opinion, explained, "(1) the EPA required Michigan to lower its ozone levels, (2) the only practical and feasible means of doing so was to enact a more stringent RVP standard, (3) that standard could only be enacted if the EPA found it necessary and approved it, (4) once the EPA approved it, Michigan could not

change that standard again without EPA approval, and (5) if Michigan fails to adequately enforce the standard, the EPA can seek sanctions against it." *Id.* at 361. "Under these circumstances," the Sixth Circuit continued, "we conclude that [§ 10d of HB 5508] is federal law." *Id.* And because § 10d was a federal law, "Ammex did not have a likelihood of success on the merits of its claims that the MDARD's enforcement of the law violates the dormant Foreign Commerce Clause or the Supremacy Clause." *Id.* at 363.

Judge Bush concurred in the judgment. Rather than finding § 10d to be federal law, Judge Bush proceeded similarly to this Court. He assumed that Ammex was attacking a state law and directly addressed Ammex's dormant Foreign Commerce Clause and Supremacy Clause arguments. *See* 936 F.3d at 368–72 (Bush, J., concurring). And for reasons similar to those provided by this Court, Judge Bush found Ammex's constitutional arguments were not likely to succeed. *See id.*

### F.

After the case returned here, Ammex filed an amended complaint. (ECF No. 49.) Ammex kept the two counts based on the dormant Foreign Commerce Clause and the Supremacy Clause. But Ammex added two additional counts in the alternative. Count III is essentially the claim anticipated by the Court in its preliminary-injunction opinion: Ammex asserts that even if § 10d of HB 5508 is a federal law, once the regulation is properly interpreted, it simply does not encompass the activities that occur at its gas station. (*See* ECF No. 49, PageID.1220.) Among other points, Ammex stresses that it exports gasoline to Canada and that according to the EPA, the Reid vapor pressure standards were never intended to apply to exported gasoline. (*See id.*) Count IV of the amended complaint asserts that even if § 10d is a federal law, and even if it is interpreted to

encompass the activity at Ammex's station, the regulation conflicts with federal statutes governing duty-free stores and thus must yield to those statutes. (*See* ECF No. 49, PageID.1222–1223.)

MDARD has moved to dismiss the entire amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 50.)

## II.

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to Ammex and determines whether its amended "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.

### A.

Count I and Count II of Ammex's amended complaint do not require extended discussion. Those counts are pled in the same way they were originally pled. (*Compare* ECF No. 1, PageID.12–15, *with* ECF No. 49, PageID.1216–1219.) And in its response to MDARD's motion to dismiss, Ammex makes no new Supremacy Clause or Foreign Commerce Clause arguments. (*See* ECF No. 54, PageID.1322–1340.) Indeed, Ammex apparently included the two counts in its amended complaint because the Sixth Circuit's ruling was at the preliminary-injunction stage of the case. (*See* ECF No. 54, PageID.1321 n.9.) As such, the Court will dismiss Counts I and II for all the reasons stated in this Court's preliminary-injunction opinion, *see* 326 F. Supp. 3d at 482–

98, and all the reasons provided by the Sixth Circuit majority and concurrence, *see* 936 F.3d at 360–63; 936 F.3d at 368–72 (Bush, J., concurring).

Further, for the reasons provided by this Court and the Court of Appeals, the Court holds that § 10d of HB 5508 is a federal regulation.

**B.**

With those preliminaries out of the way, the Court turns to Count III. In that count, Ammex asserts that § 10d of HB 5508, properly interpreted, does not apply to its gas station. Ammex's claim takes three forms.

**1.**

The first form is based on an exemption from § 10d that MDARD has created. Ammex points out that in this litigation, MDARD has taken the position that the act of fueling, i.e., transferring gasoline from Ammex's storage tanks to a car's gas tank, is conduct covered by § 10d. (ECF No. 54, PageID.1333.) But, says Ammex, MDARD does not take that position across the board. Via a *state* regulation—which was not approved by the EPA and was not made part of Michigan's implementation plan—MDARD has exempted some fueling from § 10d. In particular, Michigan Administrative Code Rule 285.561.7(2) states, "At a vehicle manufacturer's assembly facility, the fueling of production line vehicles before sale for in-plant relocation or distribution, or both, is exempt from" from the state regulations implementing § 10d. In Ammex's view, this exemption is more telling of MDARD's interpretation of § 10d than its litigation-driven position. (ECF No. 54, PageID.1333 (describing MDARD's litigation position as "unsustainable").) In other words, Ammex believes that MDARD's exemption for "vehicle manufacturer[s'] assembly facilit[ies]" is evidence that MDARD interprets § 10d to not apply to facilities that fuel cars that are driven "de minimis distances in southeastern Michigan." (ECF No. 54, PageID.1333.) And,

Ammex points out, it fuels cars that are only driven de minimis amounts in Southeast Michigan: after refueling at Ammex, the cars head into Canada. So, in Ammex's view, if the Court were to look past MDARD's litigation-driven position to MDARD's true interpretation of § 10d, it would find that MDARD really thinks § 10d does not apply to its gas station.

As an initial matter, Ammex's focus on "MDARD['s] interpretat[ion]" and "MDARD's . . . understanding" of § 10d is misplaced. (ECF No. 54, PageID.1333–1334.) Given that § 10d is a federal regulation, if deference is owed to a government agency's interpretation, it would likely be to the EPA's interpretation, not MDARD's. And besides, courts do not defer to agency interpretation of a federal regulation when the regulation is unambiguous. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("If uncertainty [over the meaning of the regulation] does not exist, there is no plausible reason for [agency] deference. The regulation then just means what it means—and the court must give it effect, as the court would any law."). And here, § 10d is unambiguous. It says that during the summer months, "the vapor pressure standard shall be 7.0 psi for dispensing facilities in Wayne[.]" And section 2(j) of HB 5508 defines a "dispensing facility" as "a site used for gasoline refueling." Thus § 10d has no exceptions for sites that fuel cars driven outside of Michigan; § 10d unambiguously says that any gasoline refueling site in Wayne County must use 7.0 RVP fuel in the summer. As such, even if MDARD interprets § 10d to not apply to sites that fuel cars that leave Southeast Michigan, that interpretation is not controlling or owed deference. *See Kisor*, 139 S. Ct. at 2414 ("[T]he possibility of deference can arise only if a regulation is genuinely ambiguous.").

And even if the Court were to engage Ammex on its terms, i.e., accept Ammex's premise that MDARD's interpretation of § 10d matters, the Court would still not find Ammex's claim plausible. Ammex uses the exemption for fueling at a vehicle manufacturer's assembly facility to

infer that MDARD does not think § 10d applies to sites that fuel cars that then burn the fuel outside Southeast Michigan. That is one possible inference. But there are others. Perhaps Ammex created the exemption because the total volume of gasoline pumped at all vehicle assembly plants in Southeast Michigan is very small relative to the total volume of gasoline pumped at all gas stations in Southeast Michigan. Perhaps Ammex created the exemption because the cost of policing refueling at an assembly plant is not worth the environmental benefit. Perhaps Ammex created the exemption because the vehicle-manufacturing lobby is strong in Michigan and pressed for the carve out. Perhaps it was due to a combination of these reasons. Or still others. Who knows? And that is the point: the inference that Ammex draws—that MDARD created the exemption because it thinks that § 10d does not apply to sites that fuel cars driven outside Southeast Michigan—is speculation. And a claim based on speculation does not get pass the plausibility threshold. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.").[1]

Nor is the Court persuaded by Ammex's fallback position: that it should get discovery on this issue. (ECF No. 54, PageID.1334.) Ammex says it filed a Freedom of Information Act request for documents underlying MDARD's exemptions from § 10d and that MDARD denied the request. (*Id.*) Ammex thinks that "non-public records in [MDARD's] possession" relating to the exemptions from § 10d "may reveal that facilities dispensing fuel not expected to be

---

[1] The Court also notes that Ammex's interpretation of § 10d would complicate enforcement of the 7.0 RVP requirement. Consider, for example, all the gas stations located both near the west border of Southeast Michigan and alongside a westbound road (e.g., a gas station on the western border of Washtenaw County accessible via an exit off of I-94 West). Vehicles refueling at these stations would be headed out of the nonattainment zone—just like cars leaving Ammex's station. Under Ammex's interpretation of § 10d, MDARD would presumably be charged with determining, on case-by-case basis, whether each of these stations is exempted from § 10d.

predominantly combusted within the eight-county region, and having a de minimis environmental impact (i.e., the Ammex Facility), are not included within the terms of" § 10d. (ECF No. 54, PageID.1333–1334.) Perhaps. But a claim must first be plausible to unlock the doors to discovery. *See Twombly*, 550 U.S. at 546 ("It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process[.]"). And for the reasons given, the Court finds Ammex's claim—that MDARD's exemptions to § 10d show that it interprets § 10d to not apply to facilities like Ammex's and that MDARD's interpretation is controlling (or owed deference)— does not cross "the line from conceivable to plausible." *See id.* at 570.

## 2.

Ammex also argues that § 10d does not apply to its gas station because the United States Environmental Protection Agency has said so. In 1989, the EPA issued a notice of final rulemaking when it promulgated national Reid vapor pressure standards for gasoline. *See Volatility Regulations for Gasoline and Alcohol Blends Sold in Calendar Years 1989 and Beyond*, 54 Fed. Reg. 11868 (Mar. 22, 1989). In that notice, the EPA said, "Because gasoline is defined in [40 C.F.R.] § 80.2(c) . . . as 'any fuel sold in any State . . .', *gasoline which is exported is not covered by the volatility regulations*." *Id.* (emphasis added). Ammex argues that it exports gasoline: it sources gasoline from Canada (or a foreign-trade zone in Ohio), keeps the gasoline beyond what U.S. Customs and Border Protection considers the "exit point" from the United States, and ensures, by the physical construction of its gas station, that those who buy gas from its station immediately head to Canada. (*See* ECF No. 54, PageID.1317–1318.) Indeed, by definition, a duty-free store sells merchandise that is delivered from the store to an "exit point for exportation by . . . individuals departing" the United States. *See* 19 C.F.R. § 19.1(a)(9). Thus, in Ammex's view, it

exports gasoline from the United States to Canada and, under the EPA's 1989 notice, its station is not subject to RVP standards for gasoline. (ECF No. 54, PageID.1335–1336.)

The EPA's statement in its 1989 notice does not make it plausible that § 10d does not apply to Ammex's gas station.

To start, that statement is 30 years old and the EPA has spoken on the issue much more recently. While this litigation was progressing, Ammex reached out to the EPA to see if the EPA thought that the RVP standards for gasoline applied to the gas it sold at its duty-free store. And the EPA responded. In a November 2019 letter, the EPA informed Ammex, "EPA's consistent position has been that fuel sold at retail in the United States is sold in the domestic market and is subject to federal fuel requirements. Ammex is a retail outlet selling fuel within the state of Michigan, and therefore federal volatility standards apply." (ECF No. 58, PageID.1404.)

Ammex stresses that the EPA's letter was based on the mistaken premise that the gas Ammex sells enters the domestic market. (ECF No. 54, PageID.1335 n.18.) (Ammex has thus asked the EPA to reconsider its current position, but, as far as this Court is aware, the EPA has not done so.) Even if the EPA did not fully appreciate what constitutes domestic commerce for customs purposes, it is clear that the EPA fully appreciated that the gas Ammex sells leaves the United States. In its November 2019 letter the EPA made very clear why § 10d applies to Ammex, "although the fuel Ammex sells at its station is immediately leaving the United States, there are still emissions impacts of the fuel's volatility while being distributed to the station, at the time of refueling, as well as impacts should the vehicle return to the United States while still running on gasoline sold by Ammex." (ECF No. 58, PageID.1405.) The EPA also stated, "Ammex sells fuel in the eight-county region that is subject to a 7.0 psi RVP for gasoline. Therefore, gasoline sold by Ammex is subject to Michigan's 7.0 psi RVP standard." (ECF No. 58, PageID.1404–1405.)

Given the EPA's 2019 letter to Ammex, the Court does not find it plausible that the EPA's position is that the RVP standards for gasoline, including § 10d, do not apply to Ammex's gas station.

And even if the Court did not consider the EPA's letter, *see Klas Mgmt., LLC v. Chubb Custom Ins. Co.*, No. 2:17-CV-12663, 2018 WL 3159676, at *4 (E.D. Mich. June 28, 2018), it is not plausible that Ammex falls within the export exception articulated in the EPA's 1989 notice. Prior to final rulemaking in 1989, a commenter expressed concern that refiners would be liable for a product exceeding the new RVP standards even though the "product is destined for export to a foreign country or is simply in storage." *EPA's 1989 Notice*, 54 Fed. Reg. at 11871. In response to this concern, the EPA made the statement upon which Ammex now relies: "Because gasoline is defined in existing § 80.2(c) of the regulations as 'any fuel sold in any State . . .', gasoline which is exported is not covered by the volatility regulations." *Id.* But elsewhere in the very same notice, the EPA expressly stated that the act of refueling is covered by the RVP standards. In particular, the EPA explained that an earlier, proposed rule did not expressly include "dispensing" gasoline but that the final rule expressly included that act: "The proposal provided that regulated parties may not 'sell, offer for sale, supply, offer for supply, or transport' gasoline whose volatility exceeds the applicable standard. In today's final rule, the word 'dispense' has been added to the list of regulated activities *to make it clear that it is a violation for any of the listed parties to dispense gasoline with excessive volatility into motor vehicles*." *EPA's 1989 Notice*, 54 Fed. Reg. at 11872 (emphasis added). Thus, even restricting the analysis to the EPA's 1989 notice, it is not plausible, as Ammex claims, that the EPA has stated that the refueling that occurs at Ammex gas station is exempt from the RVP standards.

**3.**

Ammex also argues that the federal laws governing customs-bonded warehouses generally, and duty-free stores specifically, show that § 10d does not apply to its gas station. Ammex points out that under laws Congress passed to govern customs-bonded warehouses, including duty-free stores, and under the implementing regulations promulgated by U.S. Customs and Border Protection, its gas station is beyond the "exit point" of the "Customs territory." (ECF No. 54, PageID.1336.) And, Ammex points out, the "Customs territory" includes "the States, the District of Columbia, and Puerto Rico." 19 C.F.R. § 101.1. Michigan is, of course, one of "the States." So, Ammex reasons, federal law "excludes the Ammex Facility from Michigan." (ECF No. 54, PageID.1337.) It follows, Ammex implies, that § 10d, which expressly lists eight counties inside Michigan, does not cover its gas station. (*See id.*)

The Court is not persuaded. Even if the customs laws do not consider Ammex's gas station to be within the United States, it does not follow that Ammex is not physically within "Wayne" County as that term is used in § 10d. The definitions of "exit point" and "Customs territory" are used by the CBP in deciding whether to impose import duties and in carrying out its other obligations. Ammex has given the Court no convincing reason to use a definition designed for customs purposes to interpret a federal regulation designed for environmental purposes. Moreover, there is no need to resort to the definitions found in the customs laws to decide whether Ammex's station falls within the scope of § 10d. Section 10d says that in the summertime, "the vapor pressure standard shall be 7.0 psi for dispensing facilities in Wayne, Oakland, Macomb, Washtenaw, Livingston, Monroe, St. Clair, and Lenawee counties." "Wayne" County is not ambiguous; so there is no reason to look beyond § 10d's plain text—let alone look to the unrelated customs laws for a definition.

* * *

In sum, Ammex's claim that § 10d does not apply to the refueling that occurs at its gas station does not state a plausible entitlement to relief.

## C.

No matter, says Ammex; for even if § 10d is a federal regulation, and even if the regulation applies to the refueling that occurs at its gas station, the regulation conflicts with a federal statute and thus must yield to the statute.

More specifically, the argument underlying Count IV of the amended complaint is as follows. A federal customs statute states, "*Any* merchandise subject to duty (including international travel merchandise), with the exception of perishable articles and explosive substances other than firecrackers, *may be entered for warehousing and be deposited in a bonded warehouse* . . . . *Such merchandise . . . may be withdrawn* for exportation . . . to a foreign country . . . without the payment of duties thereon[.]" 19 U.S.C. § 1557(a) (emphasis added). There is no dispute that Ammex's duty-free store is a "bonded warehouse." *See* 19 U.S.C. § 1555(b)(7); 19 C.F.R. § 19.35(a). So, argues Ammex, § 1557(a) plainly states that it may "enter[]" into its duty-free store "any merchandise subject to duty" (except perishables and explosives) and may "withdraw[]" that same merchandise. (*See* ECF No. 54, PageID.1325–1326, 1330.) And gas with an RVP of higher than 7.0 psi is "merchandise subject to duty," says Ammex. (ECF No. 54, PageID.1328–1329; *see also Ammex, Inc. v. United States*, 24 C.I.T. 851, 854–55 (2000) (holding that "the plain language of § 1557(a)(1)" "makes both [diesel fuel and gasoline] eligible for sale from duty-free stores"). So, the argument continues, § 1557(a) allows Ammex to warehouse and withdraw gasoline in the summer that has an RVP higher than 7.0 psi. (ECF No. 54, PageID.1329–1330.) And because § 10d says otherwise, it is in conflict with § 1557(a); and as a federal regulation, it

17

must yield to the federal statute. *See e.g., Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("[A] regulation contrary to a statute is void.").

A point of law is useful in addressing this argument. In its motion to dismiss, MDARD relied on *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018), to argue that so long as § 10d was not in "irreconcilable conflict" with federal customs law, the Court was required to give effect to both laws. (*See* ECF No. 50, PageID.1258–1259.) Ammex is quick to point out that while *Epic* involved two federal statutes, it is claiming a conflict between a federal statute and a federal regulation. (ECF No. 54, PageID.1332–1333.) Yet that distinction does not get Ammex very far. Ammex cites no authority for the proposition that a court should seek out conflict between two federal laws. And in related contexts, courts try to harmonize two federal laws. *See Epic*, 138 S. Ct. at 1624 (two federal statutes); *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017) (two federal regulations); *LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Mgmt. Comm'n*, 866 F.2d 616, 623 (3d Cir. 1989) (federal statute and its implementing regulation); *cf. Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010) ("As a general matter, we do not create conflicts among the circuits without strong cause. We adhere to this view because federal law (unlike state law) is supposed to be unitary."). And a harmony rule makes sense because our system of government distributes lawmaking authority among Congress and federal agencies (not to mention state legislatures and state agencies). So, in this Court's view, it generally makes sense to assume that overlapping bodies of law work in tandem rather than to assume that a law made by Congress knocks out a law created by a federal agency.

And here, § 1557(a) and § 10d can operate in harmony. Section 1557(a) says that Ammex "may . . . enter[] for warehousing" "any merchandise subject to duty" and then "withdraw[] for exportation" that merchandise "without the payment of duties thereon." 19 U.S.C. § 1557(a).

Section 10d subjects "dispensing facilities" to a 7.0 RVP standard in the summer, where a dispensing facility is "a site used for gasoline refueling." First, these two provisions can obviously be read in harmony by allowing Ammex to sell 7.0 RVP gasoline. *Cf. Ammex, Inc.*, 24 C.I.T. at 854–55. Also, because § 10d only applies to refueling sites, it can further be read to avoid conflict with § 1557(a). For instance, if Ammex obtained only sealed, air-tight containers of 9.0 RVP gasoline in the summer, it would presumably be able to sell those containers to its customers headed to Canada without running into § 10d—it would not be a site for "gasoline refueling." Yet that gives full effect to § 1557(a): in the summer, Ammex could "enter[] for warehousing" sealed, air-tight containers of 9.0 RVP gasoline ("merchandise subject to duty") and then "withdraw[] for exportation" those containers "without payment of duties thereon." In other words, § 1557(a) says nothing about the means of withdrawal of gasoline and the scope of § 10d is based on the means of withdrawal of gasoline ("refueling"). So, in this Court's view, § 1557(a) and § 10d are not in conflict. It follows that § 10d need not yield to § 1557(a).

### D.

While that suffices to dismiss all four counts of Ammex's amended complaint, one more issue needs to be addressed.

In its preliminary-injunction opinion, the Court inferred from the briefing and oral argument that if § 10d were found to be a federal regulation, the new "battleground" would become the scope of § 10d. *See Ammex*, 326 F. Supp. 3d at 486 & n.1. Namely, Ammex would argue that in 1989, the EPA stated that RVP standards did not apply to gasoline for export. *See id.* Anticipating this, the Court remarked, "it might be necessary to draw a third entity—the EPA— into that fray." *See id.* at 486.

Likely because of the Court's intimation, MDARD has argued that the EPA is a necessary party; naturally, Ammex has taken the opposite position.

But circumstances are different now than at the preliminary-injunction stage. The EPA's 1989 notice was not central to the grounds for preliminary relief; so the Court had no reason to review it in depth. And, at that time, the Court did not know what position the EPA had taken in the intervening 30 years. So the Court was concerned about Ammex and MDARD putting words in the EPA's mouth—Ammex arguing that the EPA had stated that the RVP standards did not apply to its station, MDARD arguing that the EPA said just the opposite. Better, the Court thought at the time, to hear from the EPA itself. But now the Court has studied the EPA's 1989 notice. And via its November 2019 letter to Ammex, the EPA has spoken. So the Court now knows that the EPA thinks that the RVP standards generally, and § 10d specifically, covers the refueling at Ammex's gas station. As such, the Court does not think the EPA needs to be drawn into the fray. And the EPA seems to agree. It has made no overtures to join.

Nor does the federal rule about required joinder require it. Rule 19(a)(1) says that the EPA "must be joined" if (1) without the EPA, the Court cannot afford complete relief among MDARD and Ammex or (2) the EPA "claims an interest relating to the subject" of this case and disposing of this case without the EPA's presence will (a) "as a practical matter impair or impede the [EPA's] ability to protect the interest" or (b) leave MDARD or Ammex "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the [EPA's] interest." Of these, the only possibility that requires discussion is whether the EPA would be unable to protect its interest if this litigation ultimately were to end in Ammex's favor. (It is not likely that this Court will be the last to address Ammex's claims.) Again, while the EPA undoubtedly has some interest in this case, it apparently does not have a strong interest: its letter to Ammex shows

it knows about this case; yet the EPA has not sought to intervene. Moreover, the Court does not believe that the EPA would be precluded from bringing its own enforcement action against Ammex if Ammex ultimately were victorious in this suit. MDARD represents the EPA's interests to some extent, but the EPA may well have its own arguments as to why § 10d is enforceable against Ammex, and due process likely allows EPA to make its own case. *See Taylor v. Sturgell*, 553 U.S. 880, 892–95 (2008); 7 Wright & Miller, Federal Practice & Procedure § 1604 (3d ed.) ("[E]xcept in very special circumstances it is impossible to impair the rights of nonparties in any legal sense under the principles of claim or issue preclusion."). So the Court finds that the EPA is not a person that "must be joined as a party" under Rule 19(a).

## IV.

For the reasons provided, MDARD's motion to dismiss (ECF No. 50) is GRANTED. This case is DISMISSED WITH PREJUDICE.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

Dated: March 6, 2020